CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
December 31, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| Dennis B. Reynolds, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 5:25-cv-00044 |
| Donald L. Smith, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **MEMORANDUM OPINION**

For over six years, Plaintiff Dennis B. Reynolds worked for the Augusta County Sheriff's Office under the leadership of Defendant Sheriff Donald L. Smith.  In the months following a spinal tumor diagnosis and biopsy procedure, Reynolds experienced a downturn in his mental and physical health.  Reynolds took a number of days off work.  The disputes among Reynolds, Smith, and other leadership regarding Reynolds's alleged sick leave policy violations, performance concerns, and refusal to sign disciplinary letters eventually led to Reynolds's suspension, resignation, decertification, and the instant lawsuit.

This matter is before the court on Smith's partial motion to dismiss, (Dkt. 8), and partial motion for summary judgment, (Dkt. 5).  Reynolds asserts that Smith violated his constitutional rights under the First and Fourteenth Amendments.  Reynolds also brings claims under the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of 1964, the Virginia Human Rights Act ("VHRA"), and Virginia state defamation law. (Dkt. 1.)  Smith moves to dismiss all claims in

Reynolds's complaint except the Title VII and VHRA hostile work environment claims. (Dkts. 8, 9.)  Smith contemporaneously moves for summary judgment on all ADA, Title VII, and VHRA claims for failure to exhaust administrative remedies.  (Dkts. 5, 6.)  For the following reasons, the court will grant Smith's motion for summary judgment and will grant in part and deny in part Smith's motion to dismiss.

## I.    Background

### A. Factual History[1]

In November 2016, Plaintiff Dennis B. Reynolds was hired by Defendant Sheriff Donald L. Smith as a deputy sheriff in the Augusta County Sheriff's Office ("ACSO"). (Compl. ¶¶ 9–11.)  After about two years of serving as a deputy sheriff, in December 2018, Reynolds was promoted to a K-9 handler position.  (Id. ¶ 9.)  Reynolds served in this position until his termination in July of 2023.  (Id.)

During his over six years of employment as a deputy sheriff and K-9 handler, Reynolds received "positive performance evaluations" and finished "all required training and certification programs."  (Id. ¶ 16.)  He did not face any "significant disciplinary issues prior to the events giving rise to this action."  (Id. ¶ 14.)  Reynolds notes that after he achieved certification with his K-9 in "narcotics detection, obedience, tracking, and aggression control," Smith sent Reynolds text messages congratulating Reynolds on passing.  (Id. ¶ 15.)

1. <u>Relationship Between Smith and Reynolds</u>

---

[1] Although the following facts are derived from all evidence before the court, only the allegations in Reynolds's complaint, (Compl. (Dkt. 1)), are considered when ruling on Smith's motion to dismiss, (Mot. to Dismiss (Dkt. 8)).  For purposes of resolving that motion to dismiss, the court accepts the facts alleged in the complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Over the years, Reynolds "developed and maintained a close personal and professional relationship with Defendant Smith." (*Id.* ¶ 42.) Reynolds characterizes his 1,102 text messages with Smith spanning from May 2022 through July 2023 as "highly personal and often inappropriate interactions initiated primarily by Defendant Smith." (*Id.* ¶¶ 42–44.) Of the 107 text conversations between Reynolds and Smith, 70 were initiated by Smith; "61 of these [were] predominantly personal" rather than work-related, and 16 of these Reynolds left entirely unanswered due to his discomfort. (*Id.* ¶¶ 45, 47.)

Some of Smith's texts included expressions of personal affection towards or protectiveness over Reynolds, including "I love you," "I do miss you when I can't talk to you," and "[y]ou really don't know how protective I am of you do you?" (*Id.* ¶¶ 48–49.) Others were sexually or romantically suggestive, such as "comments about the size of Plaintiff's genitalia, statements that he would 'come cuddle' Plaintiff, and offers for Plaintiff to stay at Defendant's house in Churchville." (*Id.* ¶ 50.) Even Reynolds's former girlfriend, Temple Toms, after viewing messages between Smith and Reynolds, commented that "she thought the Sheriff 'wanted' Plaintiff." (*Id.* ¶ 52.) Reynolds was "afraid to report this conduct because he feared losing his position or K-9 partner." (*Id.* ¶ 53.)

2. <u>Accident and Subsequent Investigation of Reynolds</u>

In December of 2021, Reynolds's brother "was involved in a single-vehicle accident" in Augusta County. (*Id.* ¶ 18.) In response to the accident on December 13, 2021, Reynolds called the Emergency Communications Center ("ECC") and asked them not to contact Virginia State Police ("VSP") about the crash. (*Id.* ¶ 19.) But after his brother "determined there was more damage to the vehicle than initially thought," Reynolds reached out to Trooper

Johnson at VSP to report the accident. (*Id.* ¶ 20.) Another officer then "responded to the scene, took a report, and issued a summons to [Reynolds's brother] for reckless driving." (*Id.* ¶ 21.)

About a month later, in January of 2022, an internal investigation by the ACSO revealed that Reynolds had initially instructed ECC not to call VSP about the accident. (*Id.* ¶ 22.) VSP consequently launched a formal internal investigation into "whether Plaintiff had improperly interfered with the reporting of his brother's accident," in violation of Virginia state law. (*Id.* ¶¶ 23–25.) First Sergeant Roane, a member of the ACSO, interviewed Reynolds on February 23, 2022. (*Id.* ¶ 25.) During this interview, Roane told Reynolds that VSP was investigating this incident and asked whether Reynolds had spoken to VSP. (*Id.* ¶ 26.) Reynolds "stated he was aware of the investigation but had not spoken to anyone at" VSP. (*Id.* ¶ 26.) Roane also asked Reynolds about whether he believed his brother's truck was just stuck or had been in an accident; Reynolds responded that "it was stuck." (*Id.* ¶ 27.)

On March 28, 2022, police properly obtained a search warrant for Plaintiff Reynolds's phone to investigate communications related to his brother's accident. (*Id.* ¶ 28.) Reynolds was not notified of the search warrant until his later decertification hearing. (*Id.* ¶ 27.) However, Reynolds claims that Smith, who knew of the ongoing VSP investigation, "explicitly informed [Reynolds] that the State Police would be examining his phone and directed him to delete anything involving his brother's accident." (*Id.* ¶ 30.) Smith also "ordered [Reynolds] to delete ALL text messages between [Smith] and [Reynolds]." (*Id.* ¶ 31.) Reynolds alleges that the deleted messages "included numerous inappropriate and salacious text messages" that Smith had sent to Reynolds. (*Id.* ¶ 33.)

Reynolds texted his mother on March 31 about the phone investigation: "Sheriff told me today they are goin [sic] through my phone records and want to interview people." (*Id.* ¶ 34.) Upon Reynolds's information and belief, evidence of Smith's instruction to delete communications about the accident "surfaced during the investigation," but neither VSP nor the special prosecutor "pursued [this] further." (*Id.* ¶ 40.) The investigation ended some time in Spring of 2022, when the special prosecutor declined to prosecute Reynolds for wrongdoing. (*Id.* ¶¶ 35–36.)

### 3. Reynolds's Health Conditions and Sick Leave

In early 2023, Reynolds was diagnosed with "a tumor on his T7 vertebrae," which caused him both "significant physical pain" and mental conditions including "emotional distress, anxiety, and depression." (*Id.* ¶ 55.) Reynolds underwent a biopsy procedure on March 22, 2023, after which the doctor determined the tumor was non-cancerous. (*Id.* ¶¶ 59–60.) Reynolds informed Smith of the biopsy procedure in February of 2023. (*Id.* ¶ 57.) Smith asked if Reynolds wanted Smith to go with him, and stated that if Reynolds had cancer, Smith was "going to have issues with that." (*Id.*) Smith texted Reynolds during the procedure, "I'm thinking about you and praying for you." (*Id.* ¶ 59.)

After the biopsy, Reynolds continued to suffer physical pain, as well as heightened anxiety and depression, insomnia, and difficulty concentrating. (*Id.* ¶¶ 61–62.) Reynolds explains that Smith's behavior was "one of the material contributing causes" of his anxiety and depression. (*Id.* ¶ 74.) On April 3, Smith texted Reynolds to ask how he was doing, and Reynolds responded that he was "sick" with a "sore throat cough [sic] and congestion." (*Id.* ¶ 63.) Smith replied, asking if Reynolds needed anything. (*Id.*) Smith had been made aware

- 5 -

of Reynolds's mental health conditions that "could affect his law enforcement duties" several years earlier on March 17, 2020, when Smith signed a referral form for Reynolds. (*Id.* ¶ 54.) However, Reynolds does not allege that he discussed any mental health symptoms with Smith in this April 2023 text exchange amidst the biopsy.

By May 2023, Reynolds's conditions had "intensified to the point where he required accommodations, including time off work." (*Id.* ¶ 64.) When Reynolds asked for additional time off in early May "to address his physical and mental health needs," he "was denied due to alleged staffing needs." (*Id.* ¶ 67.) ACSO has a sick leave policy, consistent with standard law enforcement agency practices, that allows the use of sick leave for physical and mental health conditions. (*Id.* ¶ 65.) Accordingly, Reynolds called Corporal Jonathan Wells to report that he was sick. (*Id.* ¶ 68.) He used his "available sick leave" to take time off on May 5 and May 6. (*Id.*) But on May 7, Wells happened to be near Reynolds's house and saw Reynolds in his yard talking to his neighbor, at which point Wells asked Reynolds if he was coming to work. (*Id.* ¶ 69.) Reynolds does not include any allegations about his response.

On May 26, Wells and Sergeant Aaron Will submitted a report stating that Reynolds "had violated Augusta County Sheriff's Office Policy 1006.4 regarding use of sick leave." (*Id.* ¶ 71.) Reynolds alleges that the report recommended he "be placed on a work plan" and "provide a doctor's note for any days that he is absent." (*Id.* ¶ 72.) Reynolds alleges that Wells and Will noted in their report that Reynolds "has made it clear that he intends on taking more sick time whenever he gets denied time off, which cannot be tolerated." (*Id.*)

Smith attaches to his motion to dismiss this report or "write up" from Wells and Will. (Dkt. 9-1.) The Fourth Circuit has held that courts can consider a document attached to a

- 6 -

motion to dismiss without converting it to a motion for summary judgment when the document is "'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge [the document's] authenticity.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Reynolds does not challenge the authenticity of the attachment. Further, Reynolds explicitly relies on the report in his complaint by describing and quoting recommendations from the "report alleging Plaintiff had violated Augusta County Sheriff's Office Policy 1006.4 regarding the use of sick leave" submitted by Wells and Will. (Compl. ¶¶ 71–73); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering reports attached to the motion to dismiss because the complaint quoted from those reports and the plaintiffs did not challenge the reports' authenticity). The document is also integral to the complaint because it contains details on Reynolds's alleged sick leave violation and the Sheriff Office's disciplinary response, which are central to Reynolds's First Amendment retaliation claim and FMLA claims. (Compl. ¶¶ 143–79.) Thus, the court may consider the document in resolving the motion to dismiss.

The report contains greater detail as to Reynolds's April 5 request for additional days off. First, it includes a list of dates—April 22, May 5 and 10, June 16–18, September 8–10, and October 31—that Reynolds had recently requested off, in addition to a list of those he had earlier requested. (Dkt. 9-1 at 1.) The report states that Wells or Will "advised [Reynolds that they] wanted to check with other deputies to make sure they did not need some time off since most had not requested an abundance of time off." (*Id.*) The report then goes on to say:

> We also have had to counsel Deputy Reynolds about taking so much time off
> and not having a K9 readily available for the shifts to use.  Deputy Reynolds
> has not been meeting the goals that has [sic] been set for him as a deputy or K9
> handler.  I feel like his excessive days off and his poor worth [sic] ethic has led
> to this.

(*Id.*)

Wells and Will explain that they denied Reynolds's request for additional days "due to the above reason and to give others a chance to have time off."  (*Id.*)  According to the report, Reynolds then told Wells that since he did not receive the additional days off, "he would just call in sick."  (*Id.*)  Just like the complaint, the report states that Reynolds later called Wells on May 5 and 6 and "advised he was sick," and Wells drove by Reynolds's house on May 7.  (*Id.* at 2.)  Wells "saw him backing his camper in the driveway that had been previously gone all weekend.  It was evident that Deputy Renolds was on a weekend outing / camping and was not truly sick."  (*Id.* at 2.)  The report then declares that this was a violation of Augusta County Sheriff's Office Policy 1006.4, which states in relevant part: "Sick leave is intended to be used for qualified absences. Sick leave is not considered vacation. Abuse of sick leave may result in discipline, denial of sick leave benefits, or both."  (*Id.*)

The report also cites Subsection 1(b) of Policy 321.6.7: "[u]nsatisfactory work performance including but not limited to failure, incompetence, inefficiency, or delay in performing and/or carrying out proper orders, work assignments, or the instructions of supervisors without a reasonable and bona fide excuse."  While the exact implication of this excerpted subsection is unclear without more of the policy, Wells and Will clarify that

> [a]side from calling in sick, Deputy Reynolds has not been meeting the goals of
> set forth [sic] by Sheriff Smith in relation to K9.  I have fielded numerous
> complaints that Deputy Reynolds doesn't assist the shift and while he is at work,
> he does help with calls or do any extra duties such as traffic or warrants. I have

had numerous conversations about the poor work ethic with Deputy Reynolds,
and it continues to go unfixed.

(*Id.*)

The report ends with a section on Wells and Will's plans for resolving their concerns

with Reynolds. (*Id.*) Specifically, they call for: (1) placing Reynolds "on a work plan that

Sheriff Smith uses" to hold him accountable and improve productivity, and (2) "requesting

that [Reynolds] provide a doctor's note for any days that he is absent." (*Id.*) For the latter,

they note that "[p]er policy, we can request this with the abuse of sick time. Deputy Reynolds

has made it clear that he intends on taking more sick time whenever he gets denied time off."

(*Id.*) Both Will and Wells signed the report on May 26, but Reynolds did not. (*Id.* at 3.)

Wells and Will met with Reynolds about the alleged policy violations on June 4.[2]

(Compl. ¶ 76.) Reynolds explained that "he needed some mental health days." (*Id.* ¶ 77.) He

gestured to his head while stating that some days he "wasn't alright." (*Id.*) Wells and Will

responded by asking Reynolds if he "needed time for mental health," but Reynolds stated that

he did not want to share additional personal medical information because it was protected by

HIPAA. (*Id.* ¶ 78.) Wells and Will also presented Reynolds with "disciplinary letters regarding

the alleged sick leave violations." (*Id.* ¶ 80.) Reynolds refused to sign the letters because he

"believed they were unjustified." (*Id.*)

After Reynolds refused to sign the letters, he was placed on suspension. (*Id.* ¶ 81.) His

badge, firearm, and vehicle were all collected. (*Id.*) On June 5, Reynolds texted Smith, asking

---

[2] Smith provides as an attachment to the motion for summary judgment Will's written account of this meeting. (Dkt. 6-3.) Under the Fourth Circuit standard for incorporation by reference, the court declines Smith's request to consider Will's account of this meeting in resolving the motion to dismiss. *See Zak*, 780 F.3d at 607. While Reynolds discusses the June 4 meeting in his complaint, he does not reference Will's summary of the events.

if he would still be suspended if he had "just signed that write up." (*Id.* ¶ 82.)  Smith responded, "You not signing the write up just made this entire thing worse." (*Id.*)  The next day, Reynolds texted Smith again, asking if he needed to return to work. (*Id.* ¶ 83.)  In response, Smith instructed Reynolds not to come back until Smith told him to and explained that Smith must "meet with Tim and figure all this out." (*Id.*)  Smith warned Reynolds that he was "in a way worse situation than [he] fail[s] to acknowledge and [his] law enforcement days could be over." (*Id.*)  Reynolds remained on suspension for over a month without an update on his investigation or opportunity to return to work. (*Id.* ¶ 85.)

4.  <u>Reynolds's Termination and Decertification Appeal</u>

On July 12, 2023, a little over a month after Reynolds's administrative suspension began, Smith texted Reynolds asking him to come in for a meeting the next afternoon. (*Id.* ¶ 86.)  On July 13, Smith gave Reynolds a "DCJS Decertification letter," which stated that his "appointment as a Deputy Sheriff for the Augusta County Sheriff's Office is terminated effective immediately." (*Id.* ¶ 87–88.)  The letter also referenced the VSP investigation regarding Reynolds's brother. (*Id.* ¶ 88.)  Several days later, on July 17, Smith texted Reynolds to set a time to meet that day. (*Id.* ¶ 89.)  Reynolds replied, "asking if he needed to turn in his resignation that day or if he could do it the following day," and Smith responded that he could do it the following day. (*Id.*)  But Reynolds submitted the letter that day, on July 17. (*Id.* ¶ 90.)

Reynolds's resignation letter stated:

It is with deepest sadness I, Dennis Reynolds, am forced to resign my position at Augusta County Sheriff's Office. Unfortunately, due to inaccurate statements/accusations and no chance at a resolution. I maintain my innocence to any allegations and would like to continue my career in Law Enforcement at another agency. I hope to have a neutral reference from you and the agency.

(*Id.*)

On the same day that Reynolds submitted his resignation, Smith submitted a Notification of Eligibility for Decertification ("VDCJS Notification") to the Virginia Department of Criminal Justice Services ("VDCJS"). (*Id.* ¶ 94.) In his motion to dismiss, Smith references the VDCJS Notification document that Smith submitted to VDCJS. (Def.'s MTD Br. at 5 n.6.) He also attaches the VDCJS Notification document to the brief in support of his contemporaneous motion for summary judgment. (Dkt. 6-6.) Under the Fourth Circuit standard for incorporation by reference, *Zak*, 780 F.3d at 607, the court may consider this document in the motion to dismiss without converting it to a motion for summary judgment. First, Reynolds does not challenge the authenticity of the document. Additionally, Reynolds not only quotes the VDCJS Notification extensively in his complaint, (*see* Compl. ¶¶ 95–97), but also relies on the contents of the VDCJS Notification as the basis for his Fourteenth Amendment due process and defamation *per se* claims, (*see* Compl. ¶¶ 94, 98, 110, 134, 137, 210, 214–15). In fact, Reynolds claims that the publication of this particular document violated his Due Process Rights and defamed him. (Compl. ¶¶ 96, 134, 210, 215.) Thus, the document is integral and may be incorporated.

The VDCJS Notification, which was signed by Smith on July 17, 2023, includes an introductory section declaring that the document "shall serve as written notice to the Criminal Justice Services Board of the potential eligibility for decertification of the individual listed below." (Dkt. 6-6 at 1.) The form then lists Reynolds's name and contact information. (*Id.*) It also identifies July 13 as Reynolds's "Date of Separation" and the reason for such separation as "Resigned" rather than "Terminated." (*Id.*; Compl. ¶ 97.)

The "Reason for Decertification" section asks the person completing it to "check all that apply" from a list of options.  (Dkt. 6-6 at 1.)  There is a checkmark on the line that reads "Terminated or resigns . . . for an act committed while in the performance of the officer's duties that compromises that compromises [sic] an officer's credibility, integrity, honesty, or other characteristics that constitute exculpatory or impeachment evident [sic] in a criminal case. (15.2-1707(B)(vi))."  (*Id.* at 2.)  The "additional information" field below the checked box includes a description, which cuts off abruptly:

> The Sheriff's Office changed Dennis Reynold's [sic] work hours from 1100 to 2100 to 1400 to midnight to better accommodate the needs of the agency. Reynolds was one of two K9 handlers for the Augusta County Sheriff's Office. Reynolds became extremely upset over the change.  Reynolds then submitted a request to have every weekend off through June and July.  His request was denied by his immediate supervisor.  At that time, Reynolds stated "I'm not working.  I will just call in sick."
> On May 5, 2023 Reynold's [sic] called his immediate supervisor and advised he was sick and could not come in to work.  He did the same on May 6, 2023.  On May 7, 2023 the supervisor rode by Reynold's [sic] residence and saw him backing his camper in the driveway that had previously been gone all weekend. It was evident that

(*Id.*)

According to Reynolds's complaint, "Smith's decertification notification cited the same alleged policy violations related to sick leave mentioned in the June 4, 2023 meeting and also referenced the prior Virginia State Police investigation for which Plaintiff was never charged with any wrongdoing."  (Compl. ¶ 96.)  While the above description of the "Reason for Decertification" discusses the alleged sick leave violations, (Dkt. 6-6 at 2), the document

provided by Defendants does not include the VSP investigation reference alleged by Reynolds.[3]

Reynolds requested a hearing to appeal this decertification. (Compl. ¶ 99.) The Executive Committee of the Criminal Justice Services Board ("CJSB") convened on January 19, 2024, to hear Reynolds's appeal. (*Id.* ¶ 100.) Reynolds alleges that, after presentation of evidence and testimony, the Executive Committee found the following: (1) the decertification was "primarily based on a sick leave dispute that did not rise to the level warranting decertification" under the cited Virginia statute, (2) Reynolds provided "sufficient evidence that he was experiencing genuine mental health concerns during the period in question," and (3) "no evidence was presented to substantiate [the VSP investigation's] relevance to the decertification."[4] (*Id.* ¶ 101.) The Committee concluded that there was good cause to overrule the decertification. (*Id.*) Accordingly, the Committee unanimously passed a motion to reinstate Reynolds's certification. (*Id.* ¶ 102.) The reinstatement letter states that "[y]ou were decertified at the request of Augusta County Sheriff's Office, pursuant to § 15.2-1707.B(vi) for acts committed in the performance of your duties that compromise your credibility, integrity, or honesty." (Dkt. 6-5 at 1.)

In his complaint, Reynolds emphasizes that, given the "close-knit" nature of the law enforcement community, Smith's Brady letter communications and attempt to revoke

---

[3] "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016). To the extent that the complaint and VDCJS Notification conflict, the court will conduct its analysis based on the VDCJS Notification.

[4] Smith attaches a letter confirming Reynolds's reinstatement to his motion to dismiss. (Dkt. 6-5.) Under the same Fourth Circuit standard for incorporation by reference, *Zak*, 780 F.3d at 607, the court concludes that it will not consider the contents of this letter in resolving the motion to dismiss, as Reynolds did not explicitly reference or rely on this particular letter from Chief Craig Branch in his complaint.

- 13 -

Reynolds's certification were devastating to his professional reputation.  (Compl. ¶ 4.)
Reynolds asserts that Smith "effectively terminat[ed]" his career in law enforcement, "caus[ed]
significant emotional distress, anxiety, and worsening of his existing mental health conditions,"
and triggered "substantial financial hardship" due to his lack of employment.  (*Id.*)

Specifically, following the reinstatement of his certification in January of 2024,
Reynolds was unable to return to his position at the ACSO.  (*Id.* ¶ 104.)  Reynolds also alleges
that Smith continued to deliver "Brady Letters" to potential employers even after the CJSB's
ruling, and that these letters included "the same discredited allegations that the Board had
rejected."  (*Id.* ¶ 106.)  For example, Major Brad Metje with the Nelson County Sheriff's Office
"reported he could not hire Plaintiff due to the Brady letters provided by Augusta County
Sheriff's Office, despite Plaintiff receiving good references from former coworkers."  (*Id.*
¶ 105.)

5.    Reynolds's Administrative Exhaustion[5]

In his complaint, Reynolds does not discuss the process of exhausting administrative
remedies for any of his claims.  But in his response to Smith's motion for summary judgment,
he admits that he did not exhaust administrative remedies as to Counts I and VII—his ADA
and VHRA claims.  (Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 1 (Dkt. 11) [hereinafter
"Pl.'s MSJ Resp."].)  He then argues that he *did* exhaust his Title VII claims and attaches an
affidavit stating that he submitted a formal complaint to the Equal Employment Opportunity
Commission ("EEOC") "on or before September 4, 2023" with the Case No. 438-2023-

---

[5] The following facts pertain to Smith's motion for summary judgment and are derived from the summary judgment
record.  Unless noted otherwise, the facts are undisputed.  Facts not material to the issues addressed in the motion for
summary judgment are omitted.

02227.  (*Id.* at 2; Reynolds Aff. ¶¶ 1–2 (Dkt. 11-1).)  He also appends a copy of his purported

submission to the EEOC, dated September 4, 2023.  (Dkt 11-2.)

This September 4 letter is addressed to the "Richmond Field Office EEOC" from

Dennis B. Reynolds.  (*Id.* at 1.)  It walks through Reynolds's career at ACSO, including his

hiring, first shifts after field training, and promotion to "Canine Handler."  (*Id.*)  It then

explains his personal struggles with "depression," his increasing discomfort with Smith's text

messages "for years," the VSP investigation after his brother's accident, the use of sick time,

and his feelings of fear surrounding his communications with Smith.  (*Id.* at 1–2.)  He also

explains a dispute about a subpoena requiring Reynolds to appear at a Circuit Court case while

he was "scheduled off" and traveling with his children, the "write up" and meeting with Wells

and Will, and Reynolds's refusal to sign the write up.  (*Id.* at 3.)  The letter ends by stating that

he "feel[s] [he] was [s]exually harassed for years."  (*Id.*)

In his affidavit, Smith states that his inquiry was closed by the EEOC on September

18, 2023, and that "a Ms. Laketa Banks from the EEOC" contacted him soon before or after

the closing of his case.  (Reynolds Aff. ¶¶ 3–4.)  In his call with Ms. Banks, Smith "was told

that the EEOC would be closing or closed [his] case and therefore would not be pursuing [his]

claim."  (*Id.* ¶ 4.)  However, Smith says that he never received any further written or

electronically mailed communication from the EEOC regarding his claim or additional

remedies.  (*Id.* ¶¶ 5–6.)

## B.  Procedural History

On May 14, 2025, Reynolds filed a complaint alleging eight causes of action against

Smith.  (Compl. ¶¶ 117–221.)  Count I is for unlawful discrimination under the ADA, 42

U.S.C. § 12101 *et seq.* (*Id.* ¶¶ 117–28.) Counts II and III are for violations of Fourteenth Amendment due process, (*id.* ¶¶ 129–42), and First Amendment retaliation, (*id.* ¶¶ 143–56), under 42 U.S.C. § 1983. Count IV is for interference under the FMLA, 29 U.S.C. § 2615(a)(1). (*Id.* ¶¶ 157–69.) Count V is for retaliation under the FMLA, 29 U.S.C. § 2615(a)(2). (*Id.* ¶¶ 170–79.) Count VI is for hostile work environment under Title VII, 42 U.S.C. § 2000e *et seq.* (*Id.* ¶¶ 180–92.) Count VII is for discrimination under VHRA, Va. Code Ann. § 2.2-3900 *et seq.* (*Id.* ¶¶ 193–205.) Count VIII is for defamation *per se* under Virginia state law. (*Id.* ¶¶ 206–21.)

Reynolds requests various forms of relief, including declaratory judgment that Smith's conduct violated each law raised in the complaint, compensatory damages of $5,000,000, punitive damages of $350,000, liquidated damages under the FMLA, and other fees and costs. (*Id.* ¶¶ 222–28.) He also asks for injunctive relief requiring Smith to (1) "expunge any negative documentation from [Reynolds's] personnel file," (2) "provide a neutral employment reference" for Reynolds, (3) stop disseminating Brady letters or negative references about Reynolds, and (4) send a letter to all law enforcement agencies that received Brady letters declaring the falsity of the earlier statements. (*Id.* ¶ 229.)

On June 13, 2025, Smith filed a partial motion to dismiss for failure to state a claim, (Mot. to Dismiss (Dkt. 8)), and a motion for summary judgment on Counts I, VI, and VII, (Mot. for Summ. J. (Dkt. 5)). Smith seeks to dismiss all counts except the Title VII (Count VI) and VHRA hostile work environment claims (Count VII). (Def.'s Mem. in Supp. of Partial Mot. to Dismiss at 2, 2 n.1 (Dkt. 9) [hereinafter "Def.'s MTD Br."].) Smith seeks summary judgment on Counts I, VI, and VII. (Def.'s Mem. in Supp. of Mot. Summ. J. at 1 (Dkt. 6)

[hereinafter "Def.'s MSJ Br."].)  On June 27, Reynolds filed responses in opposition to the motion for summary judgment, (Pl.'s MSJ Resp.), and the motion to dismiss, (Pl.'s Resp. in Opp. to Def.'s Mot. to Dismiss (Dkt. 12) [hereinafter "Pl.'s MTD Resp."]).  Smith replied to Reynolds's briefs on both motions on July 17, 2025, (Dkts. 15, 16), after being granted a motion for extension of time, (Dkts. 13, 14).

## II.    Standard of Review

### A. Rule 56 Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) instructs the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party."  *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022).  Thus, the court should only grant summary judgment if "no reasonable jury could find for the nonmoving party on the evidence before it."  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990); *see also Anderson*, 477 U.S. at 250 (explaining that courts must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict").

When ruling on a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.  *Id.* at 323.  If the moving party meets that burden, the burden shifts to the nonmoving

party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The

nonmoving party must then establish the specific material facts in dispute to survive summary

judgment. *Id.* When determining whether a genuine issue of material fact exists, the court

views the facts in the light most favorable to the nonmoving party and draws all reasonable

inferences in their favor. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).

### B. Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient

factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

facially plausible when "the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In reviewing a motion to dismiss for failure to state a claim, the court must consider

the facts from the complaint as true and "draw all reasonable inferences in favor of the

plaintiff." *Iqbal*, 556 U.S. at 678; *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020).

The court's review is generally limited to the complaint itself, Fed. R. Civ. P. 12(d), as well as

documents attached to the complaint or incorporated into the complaint by reference. Fed.

R. Civ. P. 10(c); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

If additional evidence is presented to a court on a motion under Rule 12(b)(6), the

motion must generally "be treated as one for summary judgment under Rule 56." Fed. R. Civ.

P. 12(d). However, the Fourth Circuit has held that courts can consider a document attached

to a motion to dismiss when it is "'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge [the document's] authenticity.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)).

## III.    Analysis

### A.  Counts I, VI, and VII: ADA, Title VII, and VHRA Claims

Smith concurrently moves for dismissal and for summary judgment on Count I, the ADA discrimination claim, and Count VII, the VHRA discrimination and hostile work environment claims.[6]  (Def.'s MSJ Br. at 2; Def.'s MTD Br. at 2.)  He also moves for summary judgment on Count VI, the Title VII hostile work environment claim.  (Def.'s MSJ Br. at 2.)

An employee may seek redress in federal court for Title VII violations only after he files a charge of discrimination with the EEOC, which must be done within 300 days of the alleged discriminatory act.  42 U.S.C. § 2000e-5(e)(1); *see Mills v. Inova Health Care Servs.*, No. 23-2318, 2025 WL 40550, at *2 (4th Cir. Jan. 7, 2025).  The same goes for ADA claims.  *See Altman v. McHugh*, No. 5:11-cv-00061, 2012 WL 1190271, at *7 (W.D. Va. Apr. 9, 2012), *aff'd*, 478 F. App'x 762 (4th Cir. 2012).  Similarly, an employee may only sue under the VHRA once they have timely filed a complaint in the Virginia Office of Civil Rights and have "been provided a notice of [their] right to file a civil action pursuant to § 2.2-3907."  *Hairston v. Nilit Am., Inc.*, No. 4:23-cv-00011, 2023 WL 5447370, at *3 (W.D. Va. Aug. 24, 2023) (citation omitted); Va. Code Ann. § 2.2-3908.

---

[6] Reynolds alleges two VHRA violations within Count VII: (1) discrimination on the basis of disability, and (2) hostile work environment based on sex.  (Compl. ¶¶ 201–202.)  While Smith does not move to dismiss the VHRA hostile environment claim, he does seek summary judgment on the claim.  (Def.'s MTD Br. at 2 n.1; Def.'s MSJ Br. at 2.)

Smith seeks summary judgment based on Reynolds's failure to exhaust administrative remedies as to each of these claims.  He asserts that neither he nor the ACSO have been informed of Reynolds taking any steps to exhaust administrative remedies under Title VII, ADA, or VHRA.  (Def.'s MSJ Br. at 2.)  Specifically, he states that neither he nor the ACSO received a Notice of Charge (1) from the EEOC regarding any claim from Reynolds under the ADA or Title VII, (*Id.*; Smith Decl. ¶ 3 (Dkt. 6-1)); or (2) from the Virginia Office of Civil Rights about VHRA or other claims.  (Def.'s MSJ Br. at 2; Smith Decl. ¶ 4.)

Reynolds "does not oppose Defendant's Motion to Dismiss Counts 1 and 7."  (Pl.'s MSJ Resp. at 1.)  In fact, Reynolds admits that he failed to exhaust administrative remedies as required by the ADA and VHRA.  (*Id.*); *see J.S. ex rel. Duck v. Isle of Wight Cnty. Sch. Bd.*, 402 F.3d 468, 475 n.12 (4th Cir. 2005).  When a plaintiff has clearly failed to exhaust administrative remedies as to certain claims, the court may grant summary judgment to the defendant on those claims.  *See, e.g.*, *Brooks-Mills v. Lexington Med. Ctr.*, No. 3:17-cv-01849, 2020 WL 5810518, at *10 (D.S.C. Sept. 30, 2020) (finding that defendant was "entitled to summary judgment on Plaintiff's Title VII, ADA, and ADEA claims for failure to exhaust administrative remedies").  Accordingly, Smith's motion for summary judgment as to Counts I and VII is granted.  All of Reynolds's ADA and VHRA claims fail as a matter of law.

However, Reynolds contests the summary judgment motion as to Count VI—his Title VII claim of sexual discrimination and harassment.  (Pl.'s MSJ Resp. at 2–3.)  Both parties have attached documents pertaining to administrative exhaustion that are not included in the complaint.  (*See* Dkts. 6-1–6-6, 11-1, 11-2.)  The court considers the undisputed facts from the

entire record, including these appended documents, but only in deciding whether a genuine dispute of material fact exists on Reynolds's Title VII claim.

Reynolds attests in his affidavit that he submitted a complaint to the EEOC on or before September 4, 2023, a copy of which is attached to his opposition brief. (Reynolds Aff. ¶ 2; *see* Dkt. 11-2.) Title VII charges filed with the EEOC must be "in writing under oath or affirmation." 42 U.S.C. § 2000e-5(b); *Balazs v. Liebenthal*, 32 F.3d 151, 154 (4th Cir. 1994). The EEOC regulations list the ways to meet the verification requirement: "sworn to or affirmed before a notary public, designated representative of the [EEOC], or other person duly authorized by law to administer oaths and take acknowledgements, or supported by an unsworn declaration in writing under penalty of perjury." 29 C.F.R. § 1601.3. The Fourth Circuit has long held that compliance with this provision is mandatory. *See Balazs*, 32 F.3d at 154; *Equal Emp. Opportunity Comm'n v. Appalachian Power Co.*, 568 F.2d 354, 355 (4th Cir. 1978). Put another way, "failure to comply with [the verification requirement] is fatal to an action seeking relief under Title VII." *Balazs*, 32 F.3d at 156; *Austin v. Russell Cnty. Sch. Bd.*, No. 89-0074-A, 1990 WL 300259, at *2 (W.D. Va. 1990) (granting summary judgment to the defendants because "[t]he provisions of § 2000e–5(b) plainly and simply mandate that a charge be in writing and under oath," and plaintiff failed to file a Title VII charge under oath).

Reynolds's letter, addressed to the Richmond EEOC office, includes his name and the date at the bottom in what appears to be an electronic signature. (Dkt. 11-2 at 1, 3.) But it does not include any indication that the "complaint" was made under oath or affirmation. (*See* Dkt. 11-2.) There is no language in which Reynolds declares under penalty of perjury that the

letter is true and correct.  Nor is there any evidence that the letter was sworn before a notary or other authorized individual.

Although EEOC regulations allow for amendment to "cure technical defects or omissions, including failure to verify the charge," Reynolds does not anywhere allege that he attempted to amend the charge to cure defects.  29 C.F.R. § 1601.12(b); *see Balazs*, 32 F.3d at 157.  He also has not suggested any basis by which the defect is subject to waiver or other equitable doctrines.  But even if he had, courts in the Fourth Circuit have refused to apply equitable doctrines to excuse the verification requirement.  *See Merch. v. Prince George's Cnty., Md.*, 948 F. Supp. 2d 515, 523 (D. Md. 2013) ("The Fourth Circuit's decision in *Balazs*, however, indicates that, unlike Title VII's timeliness requirements, non-compliance with the statute's verification requirement cannot be excused through application of equitable doctrines, even where the EEOC may share blame for the non-compliance."); *Crane v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 4:14-cv-01651, 2015 WL 1014400, at *4 (D.S.C. Mar. 9, 2015) ("Plaintiff's fairness arguments will not suffice to overcome what the Fourth Circuit has deemed 'a mandatory prerequisite to the validity of [a] charge.'"); *Shorter v. Md. Rural Dev. Corp.*, No. RDB–13–953, 2014 WL 3051492, at *3 (D. Md. July 2, 2014) ("Given the fact that the Fourth Circuit 'strictly observe[s]' the verification requirement, an unverified charge that was never amended by a verified, formal charge is 'simply . . . not enough' to constitute an exhaustion of Plaintiff's administrative remedies.").

Thus, even if the EEOC had, as Reynolds alleges, failed to provide Reynolds with a right-to-sue letter or any further communication following the closure of his inquiry, Reynolds's September 4 letter could not have served as a valid basis for this action.  *See*

*Merchant*, 948 F.Supp.2d at 524 ("In *Balazs*, . . . the Fourth Circuit did not appear to give any effect to the plaintiff's allegations that the EEOC had misled him into believing that his unsworn letter satisfied his exhaustion requirements."). Even when viewing all facts in a light most favorable to Reynolds, it is apparent that his Title VII charge was not verified as required by statute. Because this Title VII claim was never exhausted, and Reynolds proffers no applicable defense, the claim must fail. *See Austin*, 1990 WL 300259, at *2. Accordingly, the court grants summary judgment to Smith on Count VI.

### B. Count II: Fourteenth Amendment Due Process (42 U.S.C. § 1983)

Reynolds advances two constitutional claims under 42 U.S.C. § 1983. In the first, Count II, Reynolds alleges that Smith's actions deprived him of his protected liberty interest in "his good name, reputation, honor, and integrity." (Compl. ¶¶ 132–34.) Specifically, Reynolds claims that Smith violated his liberty interest by publishing "false and stigmatizing statements" about Reynolds's "credibility, integrity, and honesty in the Notification of Eligibility for Decertification" and by "[c]ausing these statements to be available to potential future employers" through distribution of Brady letters. (*Id.* ¶ 134.) He argues that doing so without adequate notice or meaningful opportunity to respond violates the Due Process Clause. (*Id.* ¶ 138.)

To state a "stigma-plus" procedural due process claim of liberty deprivation, a plaintiff must allege "that the charges against him (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007). "[I]njury to reputation by itself" is insufficient. *Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (citing *Paul v.*

*Davis*, 424 U.S. 693, 708-09 (1976)).  Rather, the "plus" prong requires "a plaintiff [to] demonstrate that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status."  *Shirvinski v. United States Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (citing *Paul*, 424 U.S. at 711).  The Fourth Circuit has "recognized that a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest."  *Shirvinski*, 673 F.3d at 315.

  1. Falsity

  Smith first argues that the stigmatizing statement—that "Reynolds had committed 'an act while in the performance of the officer's duties that compromises an officer's credibility, integrity, honesty or other characteristics that constitute exculpatory or impeachment evidence in a criminal case,'" (Compl. ¶¶ 95, 134 (citing Va. Code Ann. § 15.2-1707(B)(vi) (2023)))—is an opinion that cannot serve as the basis for a stigma-plus claim because it cannot be proven false.  (Def.'s MTD Br. at 17.)  Smith does not offer, and the court does not find, Fourth Circuit precedent that addresses whether subjective statements may form the basis of a stigma-plus claim or that defines the contours of "opinion" versus "fact" in stigma-plus cases.  But other circuits have briefly addressed the issue and have generally held that pure opinions, unaccompanied by implied or express facts, are insufficient for a stigma-plus claim.  *See Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998) ("True but stigmatizing statements that preclude further government employment do not support this type of claim. Nor do statements of opinion, even stigmatizing ones, if they do not imply false facts."); *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995).  Further, the Fourth Circuit has weighed in on the distinction between opinion and fact in the defamation context and has established a

similar standard.  *See Bates v. Strawbridge Studios, Inc.*, No. 7:11-cv-00216, 2012 WL 718892, at

*2 (W.D. Va. Mar. 5, 2012) ("Pure expressions of opinion, which do not contain provably

false factual connotations, cannot normally form the basis of an action for defamation."

(citation omitted) (cleaned up)).

The court disagrees with Smith that his alleged statements in the VDCJS Notification

are pure opinions such that they cannot meet the falsity element of the stigma-plus standard.

Broader concepts of "credibility, integrity, [and] honesty" undoubtedly involve subjective

matters of opinion.  However, the question of whether Reynolds terminated or resigned "for

an act committed while in the performance of the officer's duties that compromises that

compromises [sic] an officer's credibility, integrity, honesty, or other characteristics that

constitute exculpatory or impeachment evidence in a criminal case (15.2-1707 (B)(vi))" is

generally verifiable—by determining that Reynolds was or was not forced to resign based on

ACSO's determination that the cited statute applied.  *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir.

2010) (holding that the statement challenged in a stigma plus claim must be "capable of being

proved false"); *Adams v. Walker*, No. CV 20-2794, 2021 WL 5833966, at *2 (E.D. La. Dec. 9,

2021) ("[T]his Court finds that Plaintiff has alleged a stigma-plus claim against Defendant

Moody based on the *Giglio* letter.").  The exact language that Smith endorsed in the VDCJS

Notification is an excerpt from the Virginia statute, Va. Code Ann. § 15.2-1707(B)(vi), which

sets out the numerous reasons that an agency may decertify a law enforcement officer.  For

agency administrators to abide by this provision, and for the Executive Committee of the

VDCJS to review the validity of decisions made under the statute, the statement must be to

some extent capable of being proved false.

Further, in the context of the full VDCJS Notification form, (Dkt. 6-6)—which the court has already incorporated by reference and will consider in resolving the motion to dismiss, *see Zak*, 780 F.3d at 607—Smith's statements are even more clearly verifiable, as they encompass underlying factual allegations about Reynolds's request for leave and his May 2023 sick days. The statement that Reynolds committed an act "that compromises an officer's credibility, integrity, [and] honesty" necessarily implies the presence of certain underlying facts that led ACSO to discipline Reynolds. These facts are even identified in the form's descriptive field entitled "Additional Information," (Dkt. 6-6 at 2), and they could be verified as objectively true or false, (*see, e.g., id.* ("His request [to take off June and July weekends] was denied by his immediate supervisor. At that time, Reynolds stated 'I'm not working. I will just call in sick.'").) "[S]tatements of opinion" do not support a stigma plus claim, but only "if they do not imply false facts." *Strasburger*, 143 F.3d at 356. Here, Reynolds adequately alleges that Smith's representations in the VDCJS Notification form are capable of being proven false.

And unlike in *Blackburn*, Reynolds did not outright fail to allege that defendant's statements were false. *See Blackburn*, 42 F.3d at 936 ("[Defendant's] statement voicing his opinion[7] about [Plaintiff's] attitude does not constitute a false factual representation. Indeed, [Plaintiff] has made no allegation that [Defendant's] statement is false, a prerequisite for a liberty interest-stigma claim."). Reynolds explicitly attacks the truth of the main contested statement when alleging that the CJSB's reinstatement of Reynolds's certification "provides strong evidence" that "Smith's assertion that Plaintiff had committed acts that compromised

---

[7] In *Blackburn*, defendant's statement, which the court deemed an unactionable opinion, was: "I removed [plaintiff] [from the rotation list] because of his attitude. I don't need him representing the city of Marshall." 42 F.3d at 929. This is purely a personal opinion about the *Blackburn* plaintiff's attitude that is dissimilar to Smith's fact-based statements in the VDCJS Notification.

his credibility, integrity, or honesty" was "false." (Compl. ¶ 103.) Reynolds also challenges the underlying facts implied in this statement. Even though Reynolds does not expressly deny that he violated the sick leave policy, Reynolds does imply that his use of sick leave was for mental health such that it was not a violation. First, after pointing out that the ACSO's sick leave policy allowed absence for both physical and mental health conditions, (Compl. ¶ 67), he alleges that "he had used sick leave because . . . 'he needed some mental health days' and that some days he 'wasn't alright' (pointing to his head)," (*id.* ¶ 77). He asserts that he "refused to sign [the disciplinary letters about the alleged sick leave violations] because he legitimately believed they were unjustified in light of his genuine mental health needs." (*Id.* ¶ 80.) He also alleges that the VDCJS Notification referenced the VSP investigation in 2021,[8] "for which Plaintiff was never charged with any wrongdoing." (Compl. ¶ 88.)

Accordingly, Reynolds adequately alleges that Smith made false statements about Reynolds in the VDCJS Notification.

2.  Made in Conjunction with Termination

Smith also argues that the stigmatizing statements were not made in conjunction with termination, as they occurred after the termination. "[N]o deprivation of a liberty interest occurs when, in the course of defaming a person, a public official solely impairs that person's *future* employment opportunities, without subjecting him to a *present* injury such as termination of government employment." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d

---

[8] The court notes that the VDCJS Notification provided by Smith, (Dkt. 6-6), does not contain any language referencing the VSP investigation. However, the last sentence in the "Additional Information" box appears to cut off abruptly, suggesting that there could be further statements that were not included in this PDF. (*Id.* at 2.) Even if there are not, the sick leave dispute and the main contested statement about the act compromising credibility suffice to show that Reynolds alleged that Smith made a false statement.

292, 309 n.16 (4th Cir. 2006). In this case, Smith published the contested statements in the VDCJS Notification on July 17, 2023. (Compl. ¶ 94.) In his complaint and opposition brief, Reynolds argues that this publication was made "on the same day of Plaintiff's forced resignation." (Compl. ¶ 137; *see id.* ¶¶ 90, 94; Pl.'s MTD Resp. at 4.)

In his motion to dismiss, Smith argues that the "in conjunction" element is not met because the VDCJS Notification was sent to the agency after Reynolds's termination. (Def.'s MTD Br. at 18–19.) Smith cites Reynolds's allegation that he received a termination letter on July 13, 2023, for the proposition that these events were not contemporaneous. (Def.'s MTD Reply at 2–3 (Dkt. 15).) Reynolds *does* allege that Smith's letter on July 13 stated, "Your appointment as a Deputy Sheriff for the Augusta County Sheriff's Office is terminated effective immediately." (Compl. ¶ 87.) However, Reynolds also alleges that he submitted his resignation letter on July 17. (*Id.* ¶ 90, 94.) Even if the VDCJS Notification was issued 4 days after Reynolds's official termination, this gap in time is not enough to undermine Reynolds's showing that the stigmatizing statements were made in conjunction with his termination. This four-day discrepancy between the termination and publication is significantly smaller than in *Moschetti v. Nixon Peabody, LLP*, where the court held that the statements were not made in conjunction with termination because defendant's allegedly defamatory report was issued almost three months after plaintiff's termination. No. 3:23-cv-389, 2024 WL 2750010, at *11 (E.D. Va. May 29, 2024). Courts have consistently held that a period of one week or less is sufficient to meet the "in conjunction with" element. *See Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004) ("[W]e are nonetheless confident that. . . , where some of the statements were made within one week of plaintiff's termination, and were made in direct response to

requests for reasons for plaintiff's termination, that the proper nexus exists . . . ."); *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) ("[P]ublication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment. That the allegedly defamatory statements occurred several days following the announcement of Plaintiff's termination does not, of itself, defeat his claim."). Thus, Reynolds adequately alleges that the statements in the VDCJS Notification were made in conjunction with his forced resignation.

Conversely, the timeline of the termination and subsequent Brady letters[9] appears to be similar to the timeline in *Moschetti*. Although Reynolds does not identify the first dates of Brady letter delivery, he repeatedly alleges that Smith delivered the letters after CJSB's decision to reinstate his certification, which was not until January of 2024—over five months after his termination. (Compl. ¶¶ 100, 105, 106); *see also Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (finding that the district court properly dismissed a stigma plus claim where the alleged defamatory statements were made five months after the plaintiff was terminated). Thus, Reynolds does not adequately allege that the Brady letters were made in conjunction with termination, and his stigma plus claim is dismissed to the extent that it is based on alleged false statements in Brady letters.

3. <u>Publication and Sufficiently Stigmatizing Statements</u>

---

[9] Neither party explains what exactly these "Brady letters" are, when they were sent, or what they contain in this case. They appear to be letters that Smith sent to other law enforcement offices or potential employers explaining that Reynolds is decertified or had acted in a manner that compromised his credibility. *See Smith v. Wright*, No. 2:19-cv-559, 2021 WL 11474540, at *2 n.2 (E.D. Va. Apr. 12, 2021) ("A 'Brady Letter' refers to a document that identifies potential credibility issues associated with a witness, such as a police officer, in the event he is called to testify at trial.").

Reynolds also adequately alleges the other two elements showing deprivation of liberty in a stigma plus claim. First, he alleges that Smith's VDCJS Notification statements were stigmatizing, as they directly attack Reynolds's honesty, "integrity," and "credibility." (Compl. ¶ 134, 139); *see Ridpath*, 447 F.3d at 308 ("The type of communication that gives rise to a protected liberty interest implies 'the existence of serious character defects such as dishonesty or immorality.'" (citing *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982))). He also adequately alleges that the statements were in fact published to the CJSB. (*See* Compl. ¶¶ 134–35.) Smith does not refute these elements. Altogether, Reynolds has sufficiently alleged the first part of his due process claim—that he suffered a deprivation of liberty—when Smith sent the VDCJS Notification.

### 4. Notice and Opportunity to Respond

After alleging deprivation of a constitutionally protected liberty interest, the plaintiff must also allege that he was not afforded the process due for the protection of that liberty interest. *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988). Reynolds states that he was not afforded notice and a "meaningful opportunity to clear his name" before the dissemination of the VDCJS Notification. (Compl. ¶¶ 137–38.) Smith does not rebut this claim.

The Fourth Circuit has generally affirmed that name-clearing hearings in stigma plus cases must occur "*before* the State deprives a person of liberty and property." *Cannon v. Vill. of Bald Head Island, N.C.*, 891 F.3d at 504–06; *see Sciolino*, 480 F.3d at 653 ("An opportunity to clear your name *after* it has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'" (emphasis added)). Although Reynolds was given the opportunity to meet

with Corporal Wells and Sergeant Will over a month before Smith published the statements
to CJSB, this meeting was not about Reynolds's alleged Va. Code Ann. § 15.2-1707(B)(vi)
violation and was held before Reynolds had notice of Smith's intent to decertify or force
Reynolds's resignation.  (Compl. ¶¶ 76–81.)  Furthermore, the VDCJS hearing about the
alleged stigmatizing statements was in January of 2024—several months *after* Smith's initial
publication of stigmatizing statements.  (*Id.* ¶¶ 94, 100.)  Thus, the complaint sufficiently
alleges that Reynolds never received a meaningful opportunity to be heard on the credibility
charge before his decertification and termination.  *See LaChance v. Erickson*, 522 U.S. 262, 266
(1998) ("The core of due process is the right to notice and a meaningful opportunity to be
heard.").

Reynolds adequately states a due process claim under the stigma-plus theory, but only
as to the statements in the VDCJS Notification.  Accordingly, the court will deny Smith's
motion to dismiss as to Count II.

## C. Count III: First Amendment Retaliation

Count III alleges that Smith retaliated against him in violation of the First Amendment.
The court agrees with Smith that Reynolds fails to state a First Amendment retaliation claim
upon which relief can be granted.

When a government employee claims that he was disciplined because of First
Amendment activity, the plaintiff must show: "(1) that he was a 'public employee . . . speaking
as a citizen upon a matter of public concern [rather than] as an employee about a matter of
personal interest;' (2) that his 'interest in speaking upon the matter of public concern
outweighed the government's interest in providing effective and efficient services to the

public;' and (3) that his 'speech was a substantial factor in the employer's termination decision.'" *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 342 (4th Cir. 2017) (quoting *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998)).

   1.  Matter of Public Concern

   On the facts alleged by Reynolds, he was not speaking on a matter of public concern when he (1) "[d]isclosed his mental health condition to his supervisors during the June 4, 2023 meeting," (2) "[e]xplained his need for mental health days as the reason for using sick leave," (3) "[r]efused to sign disciplinary documents that he believed unjustly penalized him for using sick leave to address legitimate health needs," or (4) "[a]sserted his right to medical privacy under HIPAA." (Compl. ¶ 147.)

   Whether the speech was on a matter of public concern is an issue of law to be decided by the court. *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). The court must look at "the content, form, and context of a given statement" to determine "[w]hether an employee's speech addresses a matter of public concern." *Connick*, 461 U.S. at 147–48. "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). The Fourth Circuit has also interpreted *Connick* to "reflect[] the belief that many ordinary disputes in the public workplace should be settled or resolved without calling the heavy artillery of the Constitution into play." *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012).

Reynolds argues that the disclosure of his mental health condition on June 4—stating that "he needed some mental health days" and pointing to his head while saying that some days he "wasn't alright," (Compl. ¶ 77)—"addressed matters beyond Plaintiff's individual employment situation by implicitly advocating for better mental health accommodations within law enforcement generally," (*id.* ¶ 147).  Even when construing the facts in a light most favorable to Reynolds, he does not plausibly allege that his June 4 disclosure is anything more than an expression of his personal grievance or a complaint about his conditions of employment.  And even if Reynolds's statements did impliedly advocate for better mental health accommodations, the statements concern Reynolds and his colleagues at ACSO rather than law enforcement or the public at large.  *See Wootten v. Virginia*, No. 6:14-cv-00013, 2015 WL 1345276, at *12 (W.D. Va. Mar. 23, 2015) ("As for Plaintiff's claims regarding 'workplace safety,' they concern not the public at large, but Plaintiff and her colleagues in the Lynchburg LES office.").

The same goes for Reynolds's other statements: when he "[e]xplained his need for mental health days as the reason for using sick leave," (Compl. ¶ 147); when he "stated he didn't want to share additional personal medical information because it was protected by HIPAA, (*id.* ¶ 78); and when he "refused to sign [the disciplinary] letters because he legitimately believed they were unjustified in light of his genuine mental health needs, (*id.* ¶ 80).  Each of these are expressions of Reynolds's personal grievances and concerns arising from the dispute over his potential sick leave violation.  They are not protected speech.

In fact, Reynolds's statements "fall squarely within the framework that *Connick* established for complaints of a purely private nature."  *See Brooks*, 685 F.3d at 373.  First,

Reynolds "did not seek to inform the public that [Smith] was not discharging [his] governmental responsibilities." *Connick*, 461 U.S. at 148. Reynolds's statements were only made internally to his supervisors—Wells, Will, or Smith—not a larger audience. Second, Reynolds did not "seek to bring to light actual or potential wrongdoing or breach of public trust." *Id.* While he protested the application of the sick leave policy in his own case by refusing to sign the report, there is no evidence that he intended or sought to expose the ACSO leadership's responses to anyone but the very people he claims committed the wrongdoing. Finally, if Smith's complaint were "released to the public, [it] would convey no information at all other than the fact that a single employee [was] upset with the status quo." *Id.*

Here, Reynolds fails to allege sufficiently that he engaged in protected speech by speaking as a citizen on a matter of public concern. Accordingly, the court will dismiss Reynolds's First Amendment retaliation claims.

### D. Counts IV and V: FMLA Interference and Retaliation

Reynolds brings two FMLA claims: one alleging interference, 29 U.S.C. § 2615(a)(1), and one alleging retaliation, 29 U.S.C. § 2615(a)(2). (Compl. ¶¶ 157–79.) The court finds that Reynolds does not allege sufficient facts to plausibly support either the FMLA interference claim or the FMLA retaliation claim.

Under the FMLA, certain eligible employees are permitted to take up to twelve weeks of unpaid leave for various reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). Section 2615(a) declares it "unlawful for any employer to interfere with, restrain,

or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. *Id.* § 2615(a)(1). It also makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* § 2615(a)(2).

First, Smith argues that Reynolds was not an eligible employee under the FMLA, such that neither of the FMLA claims can survive the motion to dismiss. (Def.'s MTD Br. at 26.) Because Reynolds alleged that he "*could perform the essential functions of his position* as a Deputy Sheriff *with or without reasonable accommodation*" when pleading his ADA claim, (Compl. ¶ 123 (emphasis added)), Smith contends that Reynolds cannot then argue that he is entitled to leave under 29 U.S.C. § 2612(a)(1)(D), as this subsection requires the employee to allege that their "serious health condition [] makes the employee *unable to perform* the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D) (emphasis added). In other words, Reynolds's assertion that he could perform essential deputy sheriff functions without accommodation conflicts with his FMLA claim that his mental health condition "rendered him unable to perform the functions of his position without taking leave for treatment and recovery." (Compl. ¶ 164.)

Courts have recognized the tension between FMLA and ADA qualifications by holding that FMLA-qualifying leave may weigh against an employee being considered a qualified individual under the ADA. *See, e.g.*, *Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 979 (E.D. Va. 2012) ("[T]his Court has previously concluded that FMLA leave may be held against an employee in determining whether she is able to perform the essential functions of her job within the meaning of the ADA."); *Jahnke v. Discover Prods., Inc.*, No. 18 C 5259, 2019 WL

2248528, at *3 (N.D. Ill. May 24, 2019) ("Because [plaintiff] has pleaded that she cannot work [under the FMLA], she is not a 'qualified individual' under the ADA and therefore cannot state a claim upon which relief can be granted under the ADA."); *see also Khan v. UNC Health Care Sys.*, No. 1:20-cv-977, 2021 WL 4392012, at *7 (M.D.N.C. Sept. 24, 2021) ("[T]he ADA does not protect an employee unable to perform 'the essential functions of the employment position that such individual holds.' In contrast, the FMLA was designed to protect the employee who is 'unable to perform the functions of the position of the employee' from losing her position during the leave period."); *Payne v. Fairfax Cnty.*, No. 1:05-cv-1446, 2006 WL 3196545, at *9 (E.D. Va. Nov. 1, 2006) ("FMLA's legislative history explains that FMLA is not intended to modify or affect the . . . Americans with Disabilities Act of 1990, or the regulations issued under the act. . . . [T]he statutes should be read independently . . . ." (quoting 29 C.F.R. § 825.702)).

Generally, "when a complaint contains inconsistent and self-contradictory statements, it fails to state a claim." *Hosack v. Utopian Wireless Corp.*, No. DKC 11-0420, 2011 WL 1743297, at *5 (D. Md. May 6, 2011). "A plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits." *Epstein v. Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016) (citation omitted). Here, Reynolds's allegations surrounding his FMLA claims conflict directly with those surrounding his ADA claim, such that he fails to state a FMLA claim. But even if the court were to overlook the conflict, the FMLA claims would nevertheless fail because Reynolds does not adequately allege any notice he provided to make his employer aware that he was in need of the FMLA-qualifying leave.

2. FMLA Interference

For an FMLA interference claim, the employee must provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). However, "the employee need not expressly assert rights under the FMLA or even mention the FMLA," *id.*, nor must they use "magic words," *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009). Proper notice merely requires the employee provide "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). Once the employee has provided notice, "the responsibility falls on the employer to inquire further about whether the employee is seeking FMLA leave." *Dotson*, 558 F.3d at 295. "If the employer finds the employee's request for leave vague or insufficient, the employer should ask the employee to provide the necessary details through additional documentation and information." *Krenzke v. Alexandria Motor Cars, Inc.*, 289 F. App'x 629, 632 (4th Cir. 2008).

The court agrees with Smith that Reynolds merely calling in sick on May 5 and 6 cannot constitute sufficient FMLA notice to Smith.[10] *See* 29 C.F.R. § 825.303(b) ("Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act."). Nor can Smith's awareness of the spinal tumor diagnosis in February of 2023 reasonably serve as notice for Reynolds's need for mental health-

---

[10] In his brief in opposition to the motion to dismiss, Reynolds asserts for the first time that he "informed his supervisor on May 5, 2023, that he needed time off for health reasons, specifically stating he needed 'mental health days' and wasn't 'alright.'" (Pl.'s MTD Resp. at 7.) Reynolds does not include this allegation in his complaint; his complaint only asserts that these statements were made at the meeting on June 4. (Compl. ¶¶ 76–77, 165.) Because a plaintiff cannot amend his complaint through briefing, the court will not consider these allegations of May 5 notice to the employer. *Hurst v. District of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017).

related FMLA leave beginning four to five months later. Reynolds also asserts that he gave his supervisors sufficient notice by "[e]xplicitly inform[ing] his supervisors during the June 4, 2023 meeting that he 'needed some mental health days' and that some days he 'wasn't alright.'" (Compl. ¶ 165.) While the requirements for notice are neither formalistic nor stringent, *Lamonaca v. Tread Corp.*, No. 7:14-cv-00249, 2015 WL 3853171, at *4 (W.D. Va. June 22, 2015), even these statements referencing Reynolds's mental health concerns do not provide much detail about his condition, inability to perform job functions, or anticipated duration of the leave. *See Peeples v. Coastal Off. Prods., Inc.*, 203 F. Supp. 2d 432, 453 (D. Md. 2002) (holding an employee's FMLA notice inadequate where the employee "essentially report[ed] that he needed some unknown quantum of time off, to permit some unknown medication to take effect to deal with some unknown condition"). Indeed, it is not even clear if Reynolds was asking Wells and Will for additional leave beyond the May 5 and 6 days he had already taken off.

Further, "[a]n employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying." 29 C.F.R. § 825.302(c). In fact, "[f]ailure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying." *Id.* Reynolds alleges that, "[w]hen asked if he needed time for mental health" during the June 4 meeting, he "stated he didn't want to share additional personal medical information because it was protected by HIPAA." (Compl. ¶ 78.) Without any more information about Reynolds's mental health needs, Smith and ACSO would not reasonably be able to determine whether Reynolds's requested leave is FMLA-qualifying. *See*

*Ahmed v. Salvation Army*, 549 F. App'x 196, 197 (4th Cir. 2013) (affirming the district court's holding that because the plaintiff never submitted a completed "Certification of Health Care Provider" form, plaintiff was not entitled to FMLA protections); *Wilson v. Nash Edgecombe Econ. Dev., Inc.*, No. 5:19-CV-322, 2020 WL 5594538, at *16–18 (E.D.N.C. Sept. 18, 2020) (dismissing a FMLA claim with prejudice where plaintiff submitted a doctor's note "that indicated she needed to take time off from work" but then "refused to disclose her underlying medical condition to her employer, precluding her employer from determining whether she qualified for FMLA leave").  Because Reynolds fails to allege that he provided sufficient notice as required under the FMLA, and his allegations underlying both the FMLA and ADA claims conflict, his FMLA interference claim will be dismissed with prejudice.

    3.  <u>FMLA Retaliation</u>

    To state a claim for FMLA retaliation, a plaintiff must adequately allege that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) the adverse employment action was causally connected to the plaintiff's protected activity. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006).

    The Fourth Circuit has not yet weighed in on whether a request for non-FMLA qualifying leave can form the basis of a retaliation claim.  *See Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 482 (D. Md. 2015).  However, a number of courts, including several district courts in the Fourth Circuit, have held that to sustain a retaliation claim under the FMLA, a plaintiff must provide sufficient notice of the need for the requested leave.  *See, e.g., Edusei v. Adventist Healthcare, Inc.*, No. DKC 13–0157, 2014 WL 3345051, at *10 (D. Md. July 7, 2014); *Natal v. Arlington Cnty. Pub. Sch.*, No. 1:18-cv-1178, 2019 WL 2453659, at *7 (E.D. Va. June

12, 2019); *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012); *Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 913 (5th Cir. 2010); *see also Hightower v. Savannah River Remediation, LLC*, No. 1:13-cv-03558, 2016 WL 1128022, at *11 (D.S.C. Mar. 23, 2016), *aff'd*, 702 F. App'x 173 (4th Cir. 2017) (granting the employer summary judgment on a FMLA retaliation claim where plaintiff requested non-FMLA-qualifying leave). These courts required sufficient notice as a necessary element of plaintiff's showing that he engaged in a protected activity.

Because Reynolds failed to allege that he provided Smith with notice for purposes of FMLA interference, he also does not sufficiently allege that he engaged in protected activity. The court will dismiss the FMLA retaliation claim.

### E. Count VIII: Defamation *Per Se*

Reynolds claims that Smith's statements made to VDCJS and other "potential employers" were defamatory *per se* under Virginia law.

Virginia imposes a one-year statute of limitations on defamation claims. Va. Code Ann. § 8.01-247.1. The court agrees with Smith that any defamation claims regarding the VDCJS Notification of Eligibility of Decertification, which was published on July 17, 2023, (Compl. ¶ 210), are time-barred. Reynolds's complaint was filed on May 14, 2025, almost two years after the publication of the VDCJS Notification. (*See id.*) Reynolds does not dispute the untimeliness of his defamation claim based on the initial VDCJS Notification. (*See* Pl.'s MTD Resp. at 9–10.) It is clear from the face of Reynolds's complaint that the VDCJS Notification defamation claim is time-barred. *See Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993).

As for the Brady letters, "[t]he complaint fails to identify which specific statements plaintiff considers defamatory or libelous, as well as how these statements were published, when they were published, and to whom." *Compel v. Citi Mortg. Inc.*, No. 1:04-cv-01377, 2005 WL 4904816, at *1 (E.D. Va. Feb. 23, 2005). First, Reynolds does not allege in his complaint that Smith sent any such letters on or after May 14, 2024. However, he argues in his brief in opposition to the motion to dismiss that "Defendant continued to redistribute *Brady* letters to potential employers through at least Spring 2025" and references a proposed amended complaint, which is neither attached to the brief nor located elsewhere on the docket. (Pl.'s MTD Resp. at 9.) The court may not consider these new allegations, because "for the purposes of a motion to dismiss, [the] Plaintiff is bound by [his] Complaint and cannot amend it through [his] briefs." *Stahlman v. United States,* 995 F. Supp. 2d 446, 453 (D. Md. 2014). Without factual allegations in the complaint about the Brady letters' distribution dates, the court is unable to determine which Brady letters, if any, can serve as the basis of a defamation claim under the one-year statute of limitations.

Reynolds also fails to specify the defamatory statements contained in the Brady letters. After discussing the VDCJS Notification, he alleges that Smith sent Brady letters "containing the same defamatory statements, as referenced in paragraph 105." (Compl. ¶ 215.) Paragraph 105 does not contain any further details about the content of the Brady letter received by the Nelson County Sheriff's Office. (*Id.* ¶ 105.) Reynolds does allege that generally, the Brady "letters contained the same discredited allegations that the [Criminal Justice Services] Board had rejected," (*id.* ¶ 106), but it is unclear which allegations Reynolds is referencing (e.g., VSP investigation, sick leave violation, or general allegation of act compromising credibility under

Va. Code Ann. § 15.2-1707(B)(vi)).  Further, he only specifies one recipient of the letter—Major Brad Metje of the Nelson County Sheriff's Office.  (*Id.* ¶ 105.)

To state a claim of defamation under Virginia law, the plaintiff must adequately allege "that a defendant has published a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation." *Icenhour v. Town of Abingdon*, No. 1:19-cv-00033, 2020 WL 534055, at *4 (W.D. Va. Feb. 3, 2020) (quoting *Lewis v. Kei*, 708 S.E.2d 884, 891 (Va. 2011)).  "To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement." *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 757 (D. Md. 2015); *see also Leitner v. Liberty Univ., Inc.*, No. 6:19-cv-00029, 2020 WL 7128972 (W.D. Va. Dec. 4, 2020) (dismissing defamation claims as to statements that were "conclusory" and "devoid of further factual elaboration").  While Reynolds "need not plead exact words" of the defamatory comments, *Santos v. Christian*, No. 3:15-cv-476, 2015 WL 7738353, at *4 (E.D. Va. Nov. 30, 2015), he must provide enough detail to give the defendant fair notice and assert a plausible claim that defendant's statements were defamatory.  *See Southprint, Inc. v. H3, Inc.*, 208 F. App'x 249, 254 n.2 (4th Cir. 2006).

Overall, the court finds that "[b]y failing to allege more detailed information about defendant's statements, plaintiff denies defendant the notice necessary to raise available defenses." *Compel*, 2005 WL 4904816, at *1 (dismissing the defamation claim without prejudice and with leave to amend where the plaintiff failed to specify the statements, method and time of publication, and recipients).  Without knowing which general "discredited allegations" Reynolds is referring to, the Smith cannot attempt to rebut—and the court cannot

effectively evaluate—whether Reynolds has plausibly alleged that the letters contain actionable statements of fact.  Accordingly, the court will dismiss the defamation claim without prejudice.

### F.  Leave to Amend

The court dismisses with prejudice Reynolds's claims for which leave to amend would be futile: (1) the Fourteenth Amendment Due Process claim (Count II) to the extent that Smith argues that Brady letters sent months after his termination form the basis for his stigma plus claim; (2) the FMLA interference and retaliation claims (Counts IV and V); and (3) the defamation claim (Count VIII) to the extent that Smith argues that the time-barred VDCJS Notification or any other time-barred Brady letters constitute defamation *per se*.  Reynolds cannot amend the complaint to circumvent the fact that the Brady letters sent months after his forced resignation were not statements made in conjunction with his termination.  Similarly, Reynolds cannot amend the complaint to fix the fact that the July 2023 VDCJS Notification was sent over a year before Reynolds brought this complaint, or that any Brady letters sent before May 14, 2024, are also time-barred.  Finally, Reynolds cannot retract his previous allegations supporting his ADA claim that conflict directly with his FMLA allegations.

However, the court dismisses *without* prejudice Count III and any timely Brady letter allegations in Count VIII.  Under Rule 15, "[t]he court should freely give leave [for a party to amend its pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend a pleading "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).

In his opposition brief, Reynolds requests leave to amend these claims pursuant to Rule 15(a)(2) if the court finds that his complaint is deficient. (Pl.'s MTD Resp. at 10–11.) Reynolds does not file a separate motion for leave to amend, nor does he attach a proposed amended complaint. Smith opposes Reynolds's request for leave to amend but does not assert that granting leave to amend would be prejudicial to Smith. (Def.'s MTD Reply at 7–9.); *see Gardin v. Hi-Tex, Inc.*, No. 3:14-cv-494, 2015 WL 127868, at *2 (W.D.N.C. Jan. 8, 2015) (noting that "failing to attach the proposed complaint is not technically a violation of the Rules of Civil Procedure or the Local Rules" and granting leave to amend the complaint because the proposed amendments were "neither prejudicial nor futile").

Instead, Smith argues that "the proposed amendments" would be futile. (*Id.*) However, the court does not limit its futility analysis to the proposed amendments briefly referenced in Reynolds's opposition brief. (*See* Pl.'s MTD Resp. at 11–12.) Because Reynolds could allege sufficient facts that would allow Counts III and VIII to proceed, the court does not find that amendment would be futile. Accordingly, the court will grant Reynolds limited leave to amend. Reynolds may file an amended complaint within 21 days of the date of the accompanying Order, limited to the claims that are dismissed without prejudice (Counts III and VIII).

## IV.    Conclusion

Because Reynolds fails to show that he administratively exhausted his claims in Counts I, VI, and VII, the court will **GRANT** Smith's motion for summary judgment as to these counts. (Dkt. 5.)

Further, Reynolds fails to state a claim upon which relief can be granted against Smith as to Counts III, IV, V, and VIII. Count II, to the extent that it alleges a stigma plus due process violation based on the VDCJS Notification, survives the motion to dismiss. Accordingly, the court will **GRANT in part** and **DENY in part** Smith's motion to dismiss the complaint. (Dkt. 8.)

The court will **DISMISS** Counts III and VIII of the complaint **without prejudice.** The court will **DISMISS with prejudice** Count II to the extent that it alleges the Brady letters sent post-reinstatement form the basis of Reynolds's stigma plus claim. Reynolds's stigma plus claim based on the VDCJS Notification may proceed. The court will **DISMISS with prejudice** Counts IV and V. The court will also **DISMISS with prejudice** Count VIII to the extent it alleges that the VDCJS Notification and any other Brady letters published before May 14, 2024, constitute defamation *per se.*

Reynolds may file an amended complaint within **21 days** of the date of the accompanying Order. If he does not file an amended complaint by that date, the court will dismiss Counts III and VIII with prejudice.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 31st  day of December, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE