# DENNIS REYNOLDS VS. VIRGINIA DEPARTMENT OF CRIMINAL JUSTICE SERVICES BOARD

RICHMOND, VIRGINIA

FRIDAY, JANUARY 19, 2024

Appearances:

BISCHOFF MARTINGAYLE, PC
BY: ARIEL L. STEIN, ESQUIRE
208 East Plume Street, Suite 247
Norfolk, Virginia 23510
Stein@bischoffmartingayle.com
Counsel for Dennis Reynolds

OFFICE OF THE ATTORNEY GENERAL
BY: ERIC SMITH, ESQUIRE
202 North 9th Street
Richmond, Virginia 23219
Counsel for DCJS

VIRGINIA DEPARTMENT OF CRIMINAL JUSTICE
SERVICES BOARD:
Chief Craig Branch
Sheriff O. Balderson
Maria Jankowski
Jagdish Kaytal, Jr.
Chief Jeffrey Katz
Colonel Gary Settle
Sheriff Smith (Via Zoom)
Major Jenkins (Via Zoom)

# I N D E X


| WITNESS | PAGE |
|---|---|
| Dennis Reynolds | 13 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| B | EAP Referral | 15 |
| C | Doctor letter | 16 |

TRANSCRIPT OF PROCEEDINGS

MR. BRANCH: All right. Thank you. All right.

I'd like to come back to order. Is there any other old business to be discussed? Any other old business? All right. Hearing none, going on to new business. So next up on the agenda is the decertification of Mr. Dennis Reynolds with the Augusta County Sheriff's Office.

I now call on Mr. Eric Smith of the Office of the Attorney General to give a summary of the certification status of Mr. Reynolds.

MR. SMITH: We are here on the decertification appeal for Mr. Dennis Reynolds, formerly with the Augusta County Sheriff's Office. The decertification was submitted under 15.2-1707 (b)(6), for conduct that compromised his credibility, integrity or honesty. The decertification submission was sent to DCJS on July 17, signed by Sheriff Smith of Augusta County July 17th of 2023, and DCJS processed it and sent Mr. Reynolds his notification of decertification on July 23rd of 2023. Mr. Reynolds then timely filed his appeal.

We would note, it is his burden to provide good cause as to why he should -- his eligibility and certification should be reinstated pursuant to 15.2-1708.

In this case, the allegation is that Mr. Reynolds was untruthful to his department in that he called in sick for two days where he was actually not sick. As you can see from the additional information provided by the sheriff's office, he apparently was involved in a bit of a dispute with his agency over his schedule. He requested certain time off to his immediate supervisor. When that request was denied, he stated, I'm not working. I will just call in sick. He subsequently then did call in sick on the weekend of May 5, 6 and 7. On those days -- I believe it was May 5 and May 6 -- representatives of the Augusta Sheriff's Office drove by Mr. Reynolds' residence and he was not present, nor was his camper present on the 7th, which was a Sunday. They actually observed him backing his camper back into, I guess, his driveway. And in these supporting documentations that were provided, under Tab 6, you can see the Augusta County Sheriff's Office use of sick-leave policy.

It is a couple of pages in. It is policy 1006.4, use of sick leave. Also under Tab 6, there is a rental sales receipt for that weekend of May 5, 2023, to May 7, 2023, for a rental at an Augusta County park.

As a result of this incident, along with several other incidents that Mr. Reynolds was involved with, the Commonwealth's Attorney for Augusta County has found that he is not a credible witness and has stated he refuses to use his testimony in an official capacity. And, in fact, when I spoke with representatives from the Augusta County Sheriff's Office, they indicated to me that after this incident, any cases that would rely on Mr. Reynolds' testimony, the Office of the Commonwealth Attorney dismissed.

MR. STEIN: I know this -- I would like to note my objection for the record. These folks are not testifying to this. This is hearsay. I know this is not a court of law, but just to note it for the record for a possible appeal.

MR. BRANCH: Okay.

MR. SMITH: Representatives from the Augusta County Sheriff's Office are present and can speak to these matters if the Board needs them

to do so.

Additionally in Tab 6, you will see a letter that was filed. Unfortunately, it is undated and unsigned, but it is on letterhead from the Augusta County Commonwealth's Attorney's Office, apparently from a Botetourt Commonwealth attorney, indicating that Mr. Reynolds was reported to have made a false statement to the Virginia State Police related to a crime committed by a member of his family. While that, I don't think, directly goes to this incident, that did go into the Commonwealth's Attorney's calculations, coupled with this incident, in finding that he -- that they will not use his testimony.

MR. BRANCH: Okay.

MR. SMITH: That would be a brief summary of the evidence. I know -- obviously, Mr. Stein is here with his client, and Brian Jenkins -- Major Jenkins from Augusta County, if the Board has any questions at the appropriate time.

MR. BRANCH: Any questions for Mr. Smith? All right. Hearing none, I now call on Mr. Dennis Reynolds and/or his counsel to come and present.

MR. STEIN: I have exhibit documents here. I just want to pass it out ahead of time.

I may or may not have all of them, but each folder has all of the exhibits in it. Let me know if it is not enough.

Good afternoon. I am Ariel Stein, and, again, I'm representing Dennis Reynolds here. I just want to give a brief opening statement, then present some questions.

So the Department of Criminal Justice Services Board has been granted the power and the duty to certify and decertify law enforcement officers. The Board has the duty to ensure that a person is fit to be a law enforcement officer by certifying them, as well as the duty to remove or decertify those people that are unfit for the job. The reasons that a person can be deemed unfit and require these certifications are numerated in 1707 (a) and (b). There are 12 subsections among (a) and (b), and they provide tremendous latitude to the Board to ultimately decertify.

Now, that being said, the Board also has an equally-important duty to ensure that the act or occurrence which led to the request for decertification falls within this scope. Like all places of employment, a law enforcement department experiences workplace dysfunction, productivity

issues and chronic absenteeism. These are all issues that can impact the effectiveness of the department, and sometimes the cause of these issues needs to be addressed or even removed; however, these are not issues that require decertification, nor are they allowed under the decertification statute. And that is what Sheriff Smith of the Augusta County Sheriff's Office asked you to do in this July 17th DC1 notification. He asked you to decertify Dennis Reynolds, a seven-year veteran of the department, for allegedly committing an act that compromised his credibility, integrity, honesty or other characteristics that constitute exculpatory or impeachment evidence in a criminal trial. But, in reality, Sheriff Smith was asking you to strip a man of his livelihood because he felt that Dennis Reynolds was chronically absent, abused the Department's leave policy and was a bad fit for the department.

These are all fine reasons to get rid of an officer. Those are not reasons to decertify an officer. The act in question, alleged improper use of sick time, does not rise to this level. And that requires -- does not rise to a level

requiring decertification. And I think Sheriff Smith knew that, which is why he made reference to a year-and-a-half-old uncharged, unfounded investigation. So he is trying to conflate the two for the purposes of this decertification hearing.

Today, by the preponderance of the evidence, the Board will see that Deputy Reynolds' absence was justifiable, that there was no finding of misconduct in the Virginia State Police investigation or in the Internal Affairs investigation, that neither the supposed act is relevant -- that neither of the supposed acts are relevant or applicable to the decertification powers under 1707(b)(vi), that this Board has reinstated law enforcement officers in the past with similar but not same facts. There is good cause for Deputy Reynolds' certification to be reinstated.

With that, is Sheriff Smith available, the one who wrote the DCI notification and requested it?

MR. BRANCH: He is on the Zoom.

MR. STEIN: Does he have the knowledge of these events? I mean, he is not in this -- in

this Complaint at all. I mean in the DC1 notification. I would think that the person requesting the decertification would be the one to be -- to be present for this.

MR. BRANCH: The Agency can represent --

MR. STEIN: Just for the record, I want to note an objection to that.

MR. BRANCH: This is not a court of law.

MR. STEIN: I don't mean to be rude by doing that. I don't mean to try to impose rules. I just -- I have been through an appeal of this, and I recognize what I need to do in order to be successful on appeal, should it be necessary. And so that is -- that is why I'm doing that. I apologize if it is -- if it is --

MR. BRANCH: Okay. You can object or whatever, but, again, it is not a court of law.

MR. STEIN: And I recognize that. I said that to start with. I know it is not a court of law, but it is -- I do think it is important to note this. So I'll just go -- I'll go straight to Mr. Reynolds. Actually, let me -- if I can speak with Mr. Jenkins.

MR. BRANCH: No. Just present your cause.

MR. STEIN: Okay.
Again, note my objection that I can't speak to a fact witness.
MR. BRANCH: This is an appeal hearing, and the appeal hearing is a process for you to present good cause to why we should overturn the decertification.
MR. STEIN: And I guess my question then to you, Chairman Branch, is, are we here to pursue the truth or are we here just to rubber-stamp a DCJS decision?
MR. BRANCH: Not a rubber stamp.
MR. STEIN: I understand that. So not allowing me to interview a fact witness, someone with intimate knowledge, at least I hope, of the --
MR. BRANCH: I appreciate where you are going with that. Please present your good cause.
MR. STEIN: Okay. Yes, sir.
MR. JENKINS: Major Jenkins here. Sorry to interrupt. I put in the text chat that the sheriff is here as well. We are on Zoom together.
MR. BRANCH: Thank you.
MR. STEIN: And is it possible to just talk to the person who requested the

decertification?

MR. BRANCH: No. You're presenting to us.

MR. STEIN: Okay.

Fair enough. I can't call him as a witness? Is that what you're saying? That is --

MR. BRANCH: Is he a witness for you?

MS. STEIN: I think so.

MR. BRANCH: No. Present your cause, please.

EXAMINATION

BY MR. STEIN:

Q. With that in mind, please state your name for the record.

A. Dennis Reynolds.

Q. And how old are you?

A. Thirty-four.

Q. And are you married at this time?

A. I'm single. Divorced.

Q. Any children?

A. I have two boys, 12 years old and 10 years old, soon to be 11.

Q. So how long were you employed with the Augusta Sheriff's Department?

A. Since November 2016.

Q. And do you have any previous law enforcement experience?

A. Yes. I worked with the Staunton Sheriff's Office for a year. I worked for Middle River Regional Jail for three years. Corrections officer for about five years before then.

Q. And you left all of those places on good terms?

A. Yes.

Q. Let's talk about the events that led to today. On May 5, 2023, you called in sick?

A. Yes.

Q. And in what way were you sick?

A. I was just overwhelmed and stressed and just didn't feel in the right mind to be dealing with the public.

Q. Have you been diagnosed with any mental health issues?

A. Yes, I have.

Q. And what are they?

A. Depression and anxiety.

MR. STEIN: I would like to introduce -- and these are misnumbered (sic), so you can just -- please ignore the designations on it. So I'll be referring you to Exhibit C in the file in my

folder, yeah.

(Exhibit C marked.)

BY MR. STEIN:

Q. Is this a letter from your doctor?

A. Yes.

Q. And are you currently under his care?

A. Yes.

Q. And how long have you been under his care?

A. Since approximately 2019.

Q. What has he diagnosed you with?

A. Depression and anxiety.

Q. You're still under his care?

A. Yes.

Q. And when -- when did you start experiencing these issues?

A. Right after my divorce in 2019, I struggled with that.

Q. Was anyone in the Department aware that you suffered from mental health?

A. Yes, Sheriff Smith.

Q. Sheriff Smith was?

At one point were you referred to the EAP program?

A. Yes, sir.

MR. STEIN: I want to bring -- introduce this as another evidence exhibit. This is -- this is Exhibit B.

(Exhibit B marked.)

BY MR. STEIN:

Q. Is this documentation relating to your referral for EAP?

A. Yes, sir.

Q. Who is this e-mail from on the top?

A. It appears Major Jenkins.

Q. Who is it sent to?

A. Sheriff Smith.

Q. So both Major Jenkins and Sheriff Smith were aware of your -- that you were suffering from some mental health issues?

A. Yes, sir.

Q. You're seeing a doctor? You're seeing a therapist?

A. Yes.

Q. Regular therapy sessions?

A. Yes.

Q. What has been done medically to help you with these -- medically and therapeutically to help you with, you know, these episodes?

A. I have been diagnosed with the medications (inaudible) and I take those medications. I go to counseling. The counseling gave me some coping mechanisms to get through the depression and handle my day.

Q. What are those coping mechanisms?

A. He told me I need to pick up some hobbies, spend time with my children, and I like the outdoors. He said, you know, if you have time, go camping, enjoy the outdoors, if that makes you feel good. Get away from everything. And it is kind of a release to get out to the woods and --

Q. I can understand that.

So let's go back to May 5th. How did you feel when you woke up that morning?

A. I was overwhelmed and stressed.

Q. Did you think you could perform your duties as a deputy with the Augusta County Sheriff's Office?

A. No, I did not.

Q. Why did you think that?

A. Just, I haven't -- I noticed that -- you know, officers can make bad decisions if they are not mentally sound with a situation. For me,

already dealing with my own issues, to go out to the public and deal with somebody else's issues, I didn't feel like it would have been a fair service to the public.

Q. Did you notify the Department?

A. Yes.

Q. Who did you notify?

A. Corporal Wells.

Q. And how did you notify him?

A. Text message.

Q. What did you say to him?

A. Asked him to take a sick day.

Q. What did he say in response?

A. He said okay.

Q. So you went camping?

A. Yes.

Q. In the appeal binder, there is a receipt for camping reservation. What is the date of that receipt? I'll show it to you. What is the date of that receipt?

A. May 5th, 2023.

Q. Why did you schedule for two days when you knew you had to work the next day?

A. I just wasn't sure if I would be ready to come back.

Q. When did you return from camping?
A. I returned Sunday the 7th.
Q. Did you have work on the 7th?
A. Yes.
Q. Did you go to work that day?
A. Yes, I did.
Q. Now, did you feel better after the trip?
A. I felt extremely better.
Q. Now, when you went to work that day, did anybody from the Department say anything about your absence the day you returned?
A. No, sir.
Q. When did you learn that your superior had an issue with you taking these sick days?
A. I was pulled into the office for a counseling session on June 2nd, 2023.
Q. So almost a whole month later?
A. Yes.
Q. Was that when you first told them that you went there as a mental health day?
A. Yes.
Q. And what was their response to that?
A. I should have told somebody.
Q. But you did tell them that you were -- that you were using a sick day?

A. Yes.
Q. Okay.
We need to address something, because I think it is on everybody's mind. Presented by the AG office, there is a focus on this April 5th request for additional days off, which included May 5th. Why did you make that request in April?
A. We have to give, a year in advance, a vacation request to make sure we are staffed through the year. That is typical for every agency I have been with. You put it in a year in advance.
Q. So that was the time to make that request?
A. Yes, sir.
Q. And if you look at the -- at that letter, this write-up, is this the write-up that you were given on June 2nd?
A. Yes, it was.
Q. Okay.
It says that you -- that you requested these additional days. What were the -- did you request May 6th off?
A. No, I didn't.
Q. So was that request granted for May 5th?

A. No, it wasn't.
Q. So they -- it stated here that you -- that you said you'd just called in sick that day. Did you say that?
A. No.
Q. So in the weeks after your request was denied, but before May 5th, were you planning on going to work on May 5th?
A. Yes.
Q. What about May 4? Were you planning on going to work?
A. No. I wasn't scheduled.
Q. I'm saying -- but on May 4, were you planning on going to work the following day?
A. Oh, yes.
Q. But then you woke up on May 5 and you had a mental episode?
A. Yes. Yes.
Q. Okay.
So let's get back to that June 2nd meeting. Is that when you realized that the camping trip was suddenly a big deal?
A. Yes.
Q. And who was in that meeting?
A. Sergeant Will and Corporal Wells.

Q. How did that meeting go?
A. It didn't go well. I was pretty upset. I was -- they were trying to serve me a write-up.
Q. And was that the only discipline you got from that meeting?
A. Well, with that meeting, yes.
Q. Okay.
So there has been some mention of this Brady letter and an investigation by the Virginia State Police and Internal Affairs. I just want to briefly touch on that. So you were investigated by Virginia State Police and Internal Affairs?
A. Yes.
Q. And what was that investigation in connection with?
A. Accident involving my brother.
Q. Okay.
Was your brother charged as a result of that accident?
A. Yes, he was.
Q. Was he convicted as a result of that accident?
A. No, he wasn't.
Q. When you -- did you know that there was an investigation coming?

A. Yes. Sheriff Smith eventually told me that.

Q. Okay.

And had you -- did you feel like you had done anything wrong?

A. Absolutely not.

Q. Okay.

And were you interviewed by the Virginia State Police?

A. No, I wasn't.

Q. And what about -- what about Internal Affairs?

A. Yes, I was.

Q. Were you aware that Virginia State Police obtained a warrant for your phone on March 28th?

A. No, I wasn't.

Q. How did you become aware of that?

A. Your FOIA request.

Q. And let me ask you this: Were you charged with anything by the Virginia State Police?

A. No, I wasn't.

Q. Was there any sort of report -- a report done by the Virginia State Police, any finding of misconduct?

A. No, not that I'm aware of.
Q. Now, what about Internal Affairs? Were you interviewed by them?
A. Yes.
Q. And was -- was there ever any finding of misconduct?
A. No, sir.
Q. And you participated in an interview with them?
A. Yes.
Q. Were you ever punished by Internal Affairs?
A. No, I wasn't.
Q. You never received the results of the investigation?
A. No, I didn't.
Q. And this all occurred in -- when was the investigation?
A. The incident was in 2022. The IA investigation and interview was February 2023.
Q. And were you aware of this Brady letter from the Commonwealth Attorney's office?
A. I wasn't aware until I went to court for one of my cases and it was on the cover sheet of my case file.

Q. Between the time -- let's say the time you were interviewed by IA and the time you saw that Brady letter, did you -- were you called to testify in court?
A. Yes, I was.
Q. About how many times?
A. At least a dozen.
Q. Okay.
And did you testify the day you saw the Brady letter?
A. I was prepared to. The case actually flipped. I didn't actually testify.
Q. What about after you saw that Brady letter? Did you testify?
A. Yes.
Q. Let's get back to your termination.
So initially you were terminated on 7/13; is that correct?
A. Yes.
Q. But then there is a resignation letter in your file. What happened between those days? That was dated July 17th. What happened on those days?
A. The sheriff gave me an option to resign rather than be terminated.

Q. In your resignation letter, you vehemently deny everything but you still resigned. And why did you do that?

A. For future career opportunities.

Q. Okay.

You felt like you had no other choice?

A. No.

Q. Okay.

MR. STEIN: I don't have any further questions at this time, but I would like to reserve redirect if you have any questions.

MR. BRANCH: Any questions?

MR. MARLOWE: For the record, as an employee of the State Police, I have no knowledge of this investigation at all, so none of my comments are related to that.

I do have a question with regards to the way that DC1 reads. Was there an -- it says there was a conflict over a shift change. Can you speak to that?

MR. REYNOLDS: Yes. So my schedule was from 11:00 a.m. to 9:00 p.m. Things weren't going well in the Department. I felt like I was kind of being bullied. And, at some point, I was one of two K-9 handlers at the sheriff's office.

Eventually I was the only K-9 officer for the sheriff's office, but my -- they ended up changing my schedule. They weren't happy with my performance. I wasn't producing the statistics that were required. And my argument to the shift change -- and I may be going into too much -- but I'm a single dad of two young boys, and getting home to them and that kind of thing was important to me. Rather than get home at midnight, that made a huge difference for me as a father. But the call volume itself was higher from 11:00 a.m. to 9:00 p.m., rather than 2:00 p.m. to midnight. So I just felt like I -- they -- like the nitpicking kind of thing. It didn't make a lot of sense to me, so I was upset because this was a schedule I was used to.

MR. MARLOWE: Did that -- as written here, that times up with requesting every weekend off there --

MR. REYNOLDS: That's correct.

MR. MARLOWE: -- moving forward?

MR. REYNOLDS: That's correct.

MR. MARLOWE: Was that a -- you were requesting that time off?

MR. REYNOLDS: It was frustrating.

MR. MARLOWE: But that wasn't related to your health as just described by counsel?

MR. REYNOLDS: Right.

MR. MARLOWE: That was in response to --

MR. REYNOLDS: Yes, sir. I couldn't anticipate like what was going on.

MR. MARLOWE: And then I believe it was stated that there were no issues in that investigation that was conducted. Maybe this is a question for counsel: How did the Augusta County Commonwealth Attorney issue a Brady letter if there was no evidence presented that created such a question?

MR. STEIN: You know, that is a great question. I would love to be able to ask the sheriff, who allegedly -- who I can't speak with. But he wasn't charged. He was not -- there is no open -- they had a -- they had a warrant for his phone after that. And I believe, and I can't say for certain, that there was a grand jury impaneled. And as we all know, the old saying goes, "The grand jury can indict a ham sandwich." But my client wasn't indicted, and so I don't know what happened with that investigation. But there certainly hasn't been any findings and no charges

related to that. Yet this Brady letter that is not dated, I don't know when that is from. Obviously -- well, not obviously, because we don't know -- the sheriff's testimony would have been helpful. But there had to have been some conversation between Augusta County related to this sick leave issue and the Commonwealth Attorney's office for them to issue this letter that references --

MR. MARLOWE: Well, it says, specifically related to false statements to the Virginia State Police relating to a crime committed by a member of his family. So I -- based on what you have said, I'm assuming that would be related to the vehicle crash of --

MR. STEIN: That would be my assumption too, but Mr. Smith with the AG office testified as to some other letter that -- well, I -- there was -- you know, it -- it was just proffering, so it was hard to follow up on that point. But there was some communication regarding of -- or notification of the Commonwealth Attorney's office of the -- of the -- of the sheriff department speaking with the Commonwealth Attorney, where it was said -- and this is -- and I can have the

court reporter read this back -- but Mr. Smith stated that the Commonwealth Attorney's office would not be calling Mr. Reynolds as a witness; however, that is not in this Brady letter anywhere. It does not say that. It is just informing the defense counsel of this unfounded Virginia State Police investigation. And so, you know, I don't know where that came from. So I only -- I'm only left to assume.

As an aside about Brady letters, as a law enforcement agency, I would be -- I would be pretty upset that there is no mechanism for which an officer can get removed from the Brady list. There is no statutory mechanism. If I was -- it doesn't sound like that is something the legislature didn't even want to do, but is something that this Department could probably do, or at least make at least some sort of due process in that. Because, essentially, my client is stuck in this position where there is no criminal charges. There is no substantiated results from the Virginia State Police investigation or an IA investigation. There is a -- there is a Brady letter in his file. How is he supposed to challenge that and get it removed? There is no

way. And it's -- it is just my research on that. It is a nation-wide problem, and only two states have a mechanism on the books for which to do it. I think that is probably something that all states should have, but that was just an aside. I'll get off my soapbox here.

Yeah, there is some disconnect as to why that letter was released, why that happened, and there is no results.

MR. MARLOWE: Well, procedurally, I can speak to -- again, I don't know anything about this case. But, procedurally, an investigation is presented to the Commonwealth Attorney for consideration of charges. So there was an investigation. It is obvious. I mean, he testified there was some sort of investigation. The results of that go to the Commonwealth Attorney. It is up to the Commonwealth Attorney whether or not charges are coming. So there is a report of some sort that the Commonwealth Attorney has obviously made a decision on.

MS. STEIN: That would be nice to see. It would also be nice if there was a way to challenge this Brady letter, because it affects his ability to earn a living. And I think we can

all agree that there needs to be some sort of accountability and some sort of process to get your name removed. But that is not why he was terminated.

MR. MARLOWE: I agree. I'm not speaking to the Brady letter. I don't have anything to do with that. I was just speaking to the fact there was an investigation. Obviously you all spoke of that, and the Commonwealth Attorney is saying that decision was based on that. That is all I was --

MS. STEIN: And I don't disagree with you.

MR. MARLOWE: No further questions.

MR. BRANCH: Any other questions?

All right. Thank you.

MR. STEIN: I do have some argument.

MR. BRANCH: You're not finished?

MR. STEIN: I'm not -- just make a few legal arguments and then -- but I am done, you know, with Mr. Reynolds. But I would like -- so we all know the Code. I'm just going to really, again, emphasize a few separate things, elements of the Code.

Sheriff, chief, police or agency administrators shall notify the Board in writing

within 48 hours when any certified law enforcement or jail officer, currently employed agency, is terminated or resigns for an act committed while in the performance of his duty that compromises an officer's credibility, integrity, honesty and other characteristics that constitutes exculpatory evidence in a criminal case.

So let's break this Code section down in regards to abuse of sick-leave time, because that is the reason that he was ultimately terminated and is the first reason on the DC1 notification. So, first of all, was this even an unauthorized act to begin with? He used a sick day. He had a sick day. He was sick. It may not be what some of us consider "sick," some of us that don't suffer from mental illness would consider sick. But when you suffer from depression and anxiety, you're sick. You have an episode.

There is an EAP -- there is a letter from the doctor and an EAP referral, so his -- his department was keenly aware that he suffered from this. And we heard testimony that his therapist recommended spending time outdoors as a way to calm these episodes, to cope with these episodes, and he returned to work on the 7th once his mental

state had improved.

Now, we -- the April 5 e-mail is -- you know, it seems fishy, but it was around the time when things -- it was time to request days off, and also, it was only for the 5th. He didn't request the 6th off, and he denied saying that he would just call in sick. He denied that, and, you know, there is no testimony to the contrary.

So now let's go into the performance of his duties. This is not something that I had an opportunity to address, but this is certainly, I think, applicable here and that's he wasn't on duty when he called off sick. Said he was off duty. When asked about his camping trip when he was back on duty, he readily admitted that he went camping on June 2nd. He said, I went camping. I had to clear my head. I was having a mental health sick day. And further, if anything, calling in sick when he wasn't mentally fit to work was the best way for him to avoid a decertifiable (sic) act in the line of duty when his head was not right. Credibility, integrity, honesty, other characteristics -- Deputy Reynolds never lied. He was taking a sick day. He needed a sick day. He had a mental episode, which

qualifies as being sick, even admits -- Sheriff Smith even admits in the DC1 notification that what he did, the act was an improper use of sick time, which is merely a policy violation, not a -- not a lie, not integrity, just improper use of sick time, and that is just a -- an employment issue, not a credibility issue.

So as far as the -- as far as the VSP investigation, that is -- that happened a year and a half prior, or a year prior, maybe year and a half prior, and we have no results. We have no substantiated issue. And, as we know, 1707(h) requires that any finding of misconduct listed in (b) will not be considered final until all agreements and appeals have been exhausted and the finding of this misconduct is made final. There is no finding in this because there has not been a finding of misconduct. At least the IA investigation would have given us a finding of misconduct if there was one. It would have been introduced in this binder, and it is not, because it would have supported this case -- Augusta's case. There is a grand jury investigation. There is no -- there are no charges. It was -- he was never charged.

I understand and appreciate Captain -- Colonel Marlowe's -- his insight into it, because it is hard to know these things as an outsider, as a civilian. But you would expect that that would have been -- something like that would be part of this hearing, if it is meant to decertify an officer.

Again, there -- there is no way to get someone off a Brady list. There is no way, and there needs to be a way, so I just reiterate that.

Just to finalize, he gave a reason to call in sick. He never lied once about why he was sick. He just didn't want to tell everyone in the department that he was having a mental health day. As you all know, working in law enforcement, you don't want to show weakness to your colleagues. And some people -- and not to make assumptions about Augusta County -- but I assume that is probably not looked upon favorably in Augusta County, to have depression and anxiety as a police officer. So he didn't tell anybody. He said, I'm sick, and he was sick. There was no -- there was no act that would constitute exculpatory or impeachment evidence or a line in -- however you want to interpret the statute -- because it was

a legitimate, justifiable sick day. It wasn't due to the performance of his duties. And, essentially, he didn't do anything wrong. Now, were his numbers down? Yes. Was his attitude down? Certainly. Was he -- was he unreliable because he took so many sick days? Probably. So does he deserve to be terminated? It is likely -- I'm not in that Department. I couldn't tell you the day-to-day. Does he deserve to be decertified? No. Doesn't rise to that level. So I ask that this Board keep an open mind and consider the impact of its decertification for a man who took a sick day because he was having mental health issues.

MR. KATZ: Mr. Reynolds, have you purchased a firearm in the Commonwealth of Virginia since 2019?

MR. REYNOLDS: No.

MR. KATZ: No?

MR. REYNOLDS: I have not.

MR. KATZ: That's all I ask.

MR. BRANCH: I do have a question for you, sir.

So in this DC1, it is stating that you requested the day off and were denied by your

immediate supervisor. And then in quotes -- it has got here, "I'm not working. I will just call in sick."

Did you say that?

MR. REYNOLDS: I don't remember saying that, no.

MR. BRANCH: That is the thing that I'm harping on. You had already requested one day -- one of those days off and was denied it, then I see this. And then you come and say, well, I'm sick. So that's why I'm asking the question.

MR. REYNOLDS: Yes, sir, I understand.

MR. BRANCH: Do you remember saying that?

MR. REYNOLDS: I don't remember saying that.

MR. BRANCH: Were you upset when you were denied?

MR. REYNOLDS: I was upset when I was denied because we were well-staffed.

MR. BRANCH: The other question I had on this DC1 is the part at the end when it is talking about the -- I want to say it is like page 29 of DCJS. It said you went on a weekend camping trip. Then it says, when confronted about not being sick, camping over the weekend, Reynolds stated he

had time and he was going to take it. Did you say that?

MR. REYNOLDS: No sir.

MR. BRANCH: You did not say that?

MR. REYNOLDS: No, sir.

MR. STEIN: Chairman Branch, it would be really helpful to have Deputy Wells or -- sorry, Deputy. Let me get these ranks correct -- to have Wells or whoever was said to testify. It would be nice to support this really important proceeding.

MR. BRANCH: Any further questions? Are you done?

MR. STEIN: I am, Your Honor.

MR. BRANCH: No. See? There you go, man. Please don't do that.

MR. STEIN: You exude judge qualities.

MR. BRANCH: All right.

So you -- if you excuse us for a second, I'll now call on the Augusta County Sheriff's Office -- what is --

MR. JENKINS: Major Jenkins.

MR. BRANCH: -- or sheriff to come provide any information, if they have it, and answer questions from the --

MR. JENKINS: Yes, we will. I would like

to clarify a few things that have already been stated. The issue with Mr. Reynolds' brother occurred December 13, 2021. We became aware of that via complaints, and we launched our own Internal Affairs investigation. That IA was initiated by myself on January 12, 2022, and it was completed by my patrol lieutenant on February 3rd, 2022. There was an "unfounded" finding. We found nothing that would indicate that Reynolds did anything wrong.

In the meantime, the Virginia State Police had an investigation that we were not a party of. The State Police was investigating the wreck and subsequently investigating Mr. Reynolds' statements to them, or whatever they were investigating. We are not a part or parcel to that. We were never advised of the outcome of that. Unbeknownst to us, we did not find out about the Brady letter in reference to these incidents that was placed in Mr. Reynolds' file, filed by the Commonwealth Attorney, until 2023 when this leave situation began. We were not notified that they had placed a letter in his file. We were not consulted, and we don't have any of the documents or investigations as to what

caused that letter to be placed. I wanted to clarify that.

MR. BRANCH: Okay.

Now, is there any other images you would like to provide?

MR. REYNOLDS: No, sir.

MR. BRANCH: Do we have any questions for the Major?

I do.

MR. JENKINS: Yes, sir.

MR. BRANCH: In this DC1, it is stating that, when Mr. Reynolds' request was denied by some supervisors, that he made the comment he was not going to work and he would just call in sick. Is that true and accurate to what's being presented from the Agency?

MR. JENKINS: True and accurate to what was presented to me, yes, sir.

MR. BRANCH: The next question I have is in regards to the statement that Mr. Reynolds, when he confronted -- was confronted about not being sick and camping over the weekend, it says, Reynolds stated he had time and he was going to take it. What about that particular section?

MR. JENKINS: That date, June 2nd, when

the supervisor sat him down to do a write-up on him, he became very upset, cursed, threw the write-up in the trash can and demanded to see the sheriff. At that point, the sheriff placed him on administrative leave.

MR. BRANCH: Okay. The other question I had was with regards to notice. In regards to his mental health issues or whatever, was there any notice or any presentation of him explaining that he was having some minor difficulties as to why that was why he took the sick leave?

MR. JENKINS: Not that I'm aware of, sir.

MR. BRANCH: Anybody got any other questions?

MR. STEIN: I -- do I have an opportunity to ask questions?

MR. BRANCH: No.

MR. STEIN: Again, I note my objection.

MR. BRANCH: Any committee members have any questions for Augusta County?

Thank you. Mr. Reynolds and his counsel, I will call you back up to wrap it up and summarize your good cause.

MR. STEIN: Yes, Your --

MR. BRANCH: So there you go again.

MR. STEIN: I stopped myself, Chairman Branch. I stopped myself.

We heard that the internal investigation involving the incident came back as "unfounded," and then we heard that the Department has no knowledge of the Brady letter, nor has any knowledge of the Virginia State Police investigation. So it is -- it is difficult to address that because I'm fighting ghosts here. While I really appreciate Major Jenkins and his -- his candor in what he said, and, really, it really was -- he has no knowledge of what was said at the -- at either meeting, either the April 5th when he was denied or on June 2nd when he was asked about it or when he said -- allegedly said, I have sick days and I'm going to take them, which I -- you know, I think that doesn't -- isn't necessarily a bad thing. If you have sick days and he is sick, he is allowed to take them.

MR. BRANCH: If approved by the Agency, yes.

MR. STEIN: Does the Agency have to pre-approve sick days?

MR. BRANCH: Yeah. Sick leave is approved by the supervisor.

MR. STEIN: So my understanding is you have to -- if you're sick with the flu, you need to contact -- you need to contact and say, hey, I'm sick with the flu. Do I have permission to be at home throwing up?

MR. BRANCH: Go ahead. Whatever the Agency --

MR. REYNOLDS: I did text my corporal.

MR. BRANCH: All leave, whatever the policy is.

MR. STEIN: That is true, but --

MR. BRANCH: All leave -- it is a leave. It is not -- it is not something that you can --

MR. REYNOLDS: I acknowledged him and he acknowledged me, okay? It was approved.

MR. BRANCH: Yeah.

MR. STEIN: So, I mean, essentially, it was -- you know, it -- it does -- it is a bad look and why we addressed it, about the April e-mail requesting that day off; however, he didn't request the 6th off. That is not there. If he was doing it -- he would have requested the 6th off if he was doing it for bad reasons. He was doing it -- he was having a mental health crisis.

No further -- we have nothing further,

just that I hope you will keep an open mind when making this decision.

MR. BRANCH: The one thing I did want to ask you about, that is the sick leave policy of the sheriff's office. It says, "Employees on sick leave shall not engage in any other employment or self-employment, or participate in any sport, hobby, recreational activity or other activity that may impede recovery from mental illness." So the camping one --

MR. REYNOLDS: Yes, sir.

MR. BRANCH: -- that is the one concern for me. And if that -- is it therapeutic? Is that something that your mental health person was saying would be therapeutic for you?

MR. REYNOLDS: Yes.

MR. BRANCH: That is one of the things I wanted to ask you about.

MR. REYNOLDS: Yes, sir.

MR. BRANCH: Is that something that your doctor -- that is one of the coping mechanisms recommended as therapeutic?

MR. REYNOLDS: Yes, sir.

MR. BRANCH: The sheriffs knew of this?

MR. REYNOLDS: They did not. I didn't

discuss much, other than being in the EAP program and seeing the counselor. I really didn't discuss much else besides that. The sheriff would contact me occasionally to check on me.

MR. BRANCH: So the sheriff's office is not aware that is one of the recommended coping mechanisms?

MR. REYNOLDS: No, sir.

MR. STEIN: Nor do I think he is required to disclose that. But I think it would be helpful to maybe avoid that, but I don't think he is required to disclose.

MR. BRANCH: Yeah. I mean, again, we are trying to avoid him being terminated from -- misperceived him going on a camping trip.

MR. STEIN: Understood.

MR. BRANCH: That is why I asked the question, because if I didn't know, you know, what that was -- some things are covered under HIPAA --

MR. STEIN: Yes, sir.

MR. BRANCH: -- protected under HIPAA.

MR. STEIN: Yes, sir.

MR. BRANCH: Any other questions? That's it.

MR. STEIN: I have no further questions. Thank you for that.

MR. BRANCH: I move that the assembled Criminal Justice Services Board go into a closed meeting pursuant to Virginia Code 2-2-3711(A)(8), consultation with legal counsel employed or retained by a public body regarding specific legal matters requiring the provision of legal advice by such counsel.

MR. STEIN: Thank you all.

MR. BRANCH: Is there a second?

MR. KATZ: I second.

(Roll-call vote.)

(Closed meeting.)

(Motion to open the hearing made.)

MR. BRANCH: There is a motion. Is there a second?

MR. BALDERSON: Second.

MR. BRANCH: It has been moved by a second. If you could please call the roll.

(Roll-call taken.)

MR. BRANCH: Is there a motion on the floor?

MR. KAYTAL: Chair, I so move, based on consideration of the evidence presented today,

that we found good cause to reinstate Mr. Reynolds and that his certification should be reinstated.

MR. KATZ: I'll second.

MR. BRANCH: It will be moved properly to reinstate the certification status of Mr. Reynolds.

Any questions?

All in favor, say "Aye."

Any opposed, say, "No."

(Roll-call vote.)

MR. BRANCH: Mr. Reynolds, your eligibility for certification as a law enforcement officer has been reinstated. Written notification of the outcome will be sent certified mail to you.

Thank you.

(The hearing concluded at 1:55 p.m.)

## CERTIFICATE OF COURT REPORTER

I, Heidi D. Quimby, RMR-CCR, do hereby certify that I reported verbatim the proceedings in Richmond, Virginia, in the matter of Dennis Reynolds vs. Virginia Department of Criminal Justice Services Board.

I further certify that the foregoing is a true, accurate and complete transcript of said proceedings.

Given under my hand this date of February 20, 2026, at Newport News, Virginia.



Heidi Quimby, RMR-CCR

**(**

**(a)** 8:17
**(b)** 8:17,18 35:14
**(b)(6)** 4:18

**1**

**10** 13:21
**1006.4** 6:1
**11** 13:22
**11:00** 26:22 27:11
**12** 8:17 13:21 40:6
**13** 40:3
**15.2-1707** 4:17
**15.2-1708** 5:4
**17** 4:21
**1707** 8:16
**1707(b)(vi)** 10:15
**1707(h)** 35:12
**17th** 4:22 9:9 25:22
**1:55** 48:16

**2**

**2-2-3711(A)(8)** 47:5
**2016** 13:25
**2019** 15:10,17 37:17
**2021** 40:3
**2022** 24:19 40:6,8
**2023** 4:22,24 6:4 14:11 18:21 19:16 24:20 40:21
**23rd** 4:24
**28th** 23:15
**29** 38:22
**2:00** 27:12
**2nd** 19:16 20:18 21:20 34:16 41:25 43:14

**3**

**3rd** 40:8

**4**

**4** 21:10,13
**48** 33:1

**5**

**5** 5:16,17 6:3 14:11 21:16 34:2
**5th** 17:15 18:21 20:5, 7,25 21:7,8 34:5 43:13

**6**

**6** 5:16,17,24 6:2 7:2
**6th** 20:23 34:6 44:21, 22

**7**

**7** 5:16 6:4
**7/13** 25:17
**7th** 5:20 19:2,3 33:25

**9**

**9:00** 26:22 27:12

**A**

**a.m.** 26:22 27:11
**ability** 31:25
**absence** 10:9 19:11
**absent** 9:18
**absenteeism** 9:1
**Absolutely** 23:6
**abuse** 33:9
**abused** 9:18
**accident** 22:16,19, 22
**accountability** 32:2
**accurate** 41:15,17
**acknowledged** 44:14,15
**act** 8:21 9:12,23 10:12 33:3,13 34:21 35:3 36:23
**activity** 45:8
**acts** 10:13
**additional** 5:9 20:6, 22
**Additionally** 7:2
**address** 20:3 34:11 43:9
**addressed** 9:4 44:19
**administrative** 42:5
**administrators** 32:25
**admits** 35:1,2
**admitted** 34:15
**advance** 20:8,12
**advice** 47:8
**advised** 40:17
**Affairs** 10:11 22:10, 12 23:12 24:2,12 40:5
**affects** 31:24
**afternoon** 8:4
**AG** 20:5 29:17
**agency** 5:11 11:5 20:11 30:11 32:24 33:2 41:16 43:20,22 44:7
**agenda** 4:8
**agree** 32:1,5
**agreements** 35:15
**ahead** 7:25 44:6
**allegation** 5:5
**alleged** 9:23
**allegedly** 9:12 28:16 43:15
**allowed** 9:6 43:19
**allowing** 12:14
**and/or** 7:23
**anticipate** 28:6
**anxiety** 14:21 15:12 33:17 36:20
**apologize** 11:15
**apparently** 5:10 7:6
**appeal** 4:15,25 6:21 11:11,13 12:4,5 18:17
**appeals** 35:15
**appears** 16:10
**applicable** 10:14 34:12
**approved** 43:20,25 44:15
**approximately** 15:10
**April** 20:5,7 34:2 43:13 44:19
**argument** 27:5 32:16
**arguments** 32:19
**Ariel** 8:4
**assembled** 47:3
**assume** 30:9 36:18
**assuming** 29:14
**assumption** 29:16
**assumptions** 36:17
**attitude** 37:4
**attorney** 4:12 6:8,16 7:7 28:11 29:24 31:13,18,20 32:9 40:21
**Attorney's** 7:5,12 24:22 29:8,22 30:2
**Augusta** 4:10,16,21

5:18,24 6:4,9,12,24 7:5,19 9:8 13:24 17:19 28:10 29:6 36:18,19 39:19 42:20

**Augusta's** 35:22

**avoid** 34:20 46:11,14

**aware** 15:19 16:14 23:14,17 24:1,21,23 33:21 40:3 42:12 46:6

**Aye** 48:8

B

**back** 4:5 5:22 17:15 18:25 21:20 25:16 30:1 34:15 42:22 43:4

**backing** 5:21

**bad** 9:19 17:24 43:18 44:18,23

**BALDERSON** 47:18

**based** 29:13 32:10 47:24

**began** 40:22

**begin** 33:13

**big** 21:22

**binder** 18:17 35:21

**bit** 5:10

**Board** 6:25 7:19 8:9,11,19,20 10:8,15 32:25 37:11 47:4

**body** 47:7

**books** 31:3

**Botetourt** 7:6

**boys** 13:21 27:7

**Brady** 22:9 24:21 25:3,10,13 28:11 29:1 30:4,10,13,23 31:24 32:6 36:9 40:19 43:6

**Branch** 4:3 6:22 7:15,21 10:23 11:5,8,16,24 12:4,9,12,17,23 13:2,7,9 26:12 32:14,17 37:22 38:7,13,16,20 39:4,6,11,14,17,22 41:3,7,11,19 42:6,13,17,19,25 43:2,20,24 44:6,9,12,16 45:3,12,17,20,24 46:5,13,17,22,24 47:3,11,16,19,22 48:4,11

**break** 33:8

**Brian** 7:18

**briefly** 22:11

**bring** 16:1

**brother** 22:16,18 40:2

**bullied** 26:24

**burden** 5:1

**business** 4:6,7,8

C

**calculations** 7:12

**call** 4:11 5:14,15 7:22 13:5 27:11 34:7 36:12 38:2 39:19 41:14 42:22 47:20

**called** 5:7 14:11 21:3 25:3 34:13

**calling** 30:3 34:19

**calm** 33:24

**camper** 5:20,22

**camping** 17:10 18:15,18 19:1 21:22 34:14,16 38:23,25 41:22 45:10 46:15

**candor** 43:11

**capacity** 6:11

**Captain** 36:1

**care** 15:6,9,13

**career** 26:4

**case** 5:5 24:25 25:11 31:12 33:7 35:22,23

**cases** 6:14 24:24

**caused** 41:1

**certification** 4:13 5:3 10:18 48:2,5,12

**certifications** 8:16

**certified** 33:1 48:14

**certify** 8:10

**certifying** 8:13

**Chair** 47:24

**Chairman** 12:9 39:6 43:1

**challenge** 30:25 31:24

**change** 26:19 27:6

**changing** 27:2

**characteristics** 9:14 33:6 34:23

**charged** 22:18 23:20 28:17 35:25

**charges** 28:25 30:21 31:14,19 35:24

**chat** 12:21

**check** 46:4

**chief** 32:24

**children** 13:20 17:8

**choice** 26:6

**chronic** 9:1

**chronically** 9:18

**civilian** 36:4

**clarify** 40:1 41:2

**clear** 34:17

**client** 7:18 28:23 30:19

**closed** 47:4,14

**Code** 32:21,23 33:8 47:5

**colleagues** 36:16

**Colonel** 36:2

**comment** 41:13

**comments** 26:16

**committed** 7:9 29:12 33:3

**committee** 42:19

**committing** 9:12

**Commonwealth** 6:16 7:6 24:22 28:11 29:7,22,24 30:2 31:13,17,18,20 32:9 37:16 40:21

**Commonwealth's** 6:8 7:5,12

**communication** 29:21

**Complaint** 11:1

**complaints** 40:4

**completed** 40:7

**compromised** 4:18 9:12

**compromises** 33:4

**concern** 45:12

**concluded** 48:16

**conduct** 4:18

**conducted** 28:9

**conflate** 10:4

**conflict** 26:19

**confronted** 38:24 41:21

**connection** 22:15

**consideration** 31:14 47:25

**considered** 35:14

**constitute** 9:14 36:23

**constitutes** 33:6

**consultation** 47:6

**consulted** 40:24

**contact** 44:3 46:3

**contrary** 34:8

**conversation** 29:6

**convicted** 22:21

**cope** 33:24

**coping** 17:4,6 45:21 46:6

**corporal** 18:8 21:25 44:8

**correct** 25:18 27:20, 22 39:8

**Corrections** 14:5

**counsel** 7:23 28:2, 10 30:6 42:21 47:6,9

**counseling** 17:3 19:16

**counselor** 46:2

**County** 4:10,16,21 5:25 6:5,9,13,24 7:5, 19 9:8 17:19 28:10 29:6 36:18,20 39:19 42:20

**couple** 6:1

**coupled** 7:13

**court** 6:20 11:8,17, 19 24:23 25:4 30:1

**cover** 24:24

**covered** 46:19

**crash** 29:15

**created** 28:12

**credibility** 4:19 9:13 33:5 34:22 35:7

**credible** 6:9

**crime** 7:9 29:12

**criminal** 8:8 9:15 30:20 33:7 47:4

**crisis** 44:24

**cursed** 42:2

**D**

**dad** 27:7

**date** 18:18,19 41:25

**dated** 25:22 29:2

**day** 17:5 18:12,23 19:5,9,11,20,25 21:3, 14 25:9 33:13,14 34:18,24,25 36:14 37:1,13,25 38:8 44:20

**day-to-day** 37:9

**days** 5:7,16 18:22 19:14 20:6,22 25:21, 23 34:4 37:6 38:9 43:16,18,23

**DC1** 9:9 11:1 26:18 33:11 35:2 37:24 38:21 41:11

**DCI** 10:21

**DCJS** 4:20,22 12:11 38:23

**deal** 18:2 21:22

**dealing** 14:15 18:1

**December** 40:3

**decertifiable** 34:21

**decertification** 4:9, 15,17,20,23 8:23 9:6, 7 10:1,5,14 11:3 12:7 13:1 37:12

**decertified** 37:10

**decertify** 8:10,14,19 9:10,22 36:6

**decision** 12:11 31:21 32:10 45:2

**decisions** 17:24

**deemed** 8:15

**defense** 30:6

**demanded** 42:3

**denied** 5:13 21:7 34:6,7 37:25 38:9,17, 19 41:12 43:14

**Dennis** 4:9,15 7:22 8:5 9:10,17 13:15

**deny** 26:2

**department** 5:6 8:8, 24 9:3,11,20 13:24 15:19 18:5 19:10 26:23 29:13 30:17 33:21 36:14 37:8 43:5

**Department's** 9:19

**depression** 14:21 15:12 17:5 33:17 36:20

**deputy** 10:8,18 17:19 34:23 39:7,8

**deserve** 37:7,9

**designations** 14:24

**diagnosed** 14:17 15:11 17:1

**difference** 27:10

**difficult** 43:8

**difficulties** 42:10

**directly** 7:11

**disagree** 32:11

**discipline** 22:4

**disclose** 46:10,12

**disconnect** 31:7

**discuss** 46:1,2

**discussed** 4:6

**dismissed** 6:16

**dispute** 5:11

**divorce** 15:17

**Divorced** 13:19

**doctor** 15:4 16:17 33:20 45:21

**documentation** 16:6

**documentations** 5:23

**documents** 7:24 40:25

**dozen** 25:7

**driveway** 5:22

**drove** 5:18

**due** 30:18 37:1

**duties** 17:19 34:10 37:2

**duty** 8:10,11,13,21 33:4 34:13,14,15,21

**dysfunction** 8:25

**E**

**e-mail** 16:9 34:2 44:19

**EAP** 15:23 16:7 33:19,20 46:1

**earn** 31:25

**effectiveness** 9:2

**elements** 32:22

**eligibility** 5:3 48:12

**else's** 18:2

**emphasize** 32:22

**employed** 13:23 33:2 47:6

**employee** 26:14

**Employees** 45:5

**employment** 8:24 35:6 45:6

**end** 38:21

**ended** 27:2

**enforcement** 8:10, 12,24 10:16 14:2 30:11 33:1 36:15 48:12

**engage** 45:6

**enjoy** 17:10

**ensure** 8:11,21

**episode** 21:17 33:18 34:25

**episodes** 16:24 33:24

**equally-important** 8:21

**Eric** 4:11

**essentially** 30:19 37:3 44:17

**events** 10:25 14:10

**eventually** 23:1 27:1
**everybody's** 20:4
**evidence** 7:17 9:15 10:8 16:2 28:12 33:7 36:24 47:25
**EXAMINATION** 13:11
**exculpatory** 9:14 33:6 36:23
**excuse** 39:18
**exhausted** 35:15
**exhibit** 7:24 14:25 15:2 16:2,3,4
**exhibits** 8:2
**expect** 36:4
**experience** 14:2
**experiences** 8:25
**experiencing** 15:16
**explaining** 42:9
**extremely** 19:8
**exude** 39:16

F

**fact** 6:11 12:3,14 32:7
**facts** 10:17
**fair** 13:5 18:3
**falls** 8:23
**false** 7:8 29:11
**family** 7:10 29:13
**father** 27:10
**favor** 48:8
**favorably** 36:19
**February** 24:20 40:7
**feel** 14:15 17:11,16 18:3 19:7 23:4
**felt** 9:17 19:8 26:6,23 27:13
**fighting** 43:9
**file** 14:25 24:25 25:21 30:24 40:20,24
**filed** 4:25 7:3 40:21
**final** 35:14,16
**finalize** 36:11
**find** 40:18
**finding** 7:13 10:9 23:24 24:5 35:13,16, 17,18,19 40:8
**findings** 28:25
**fine** 9:21
**finished** 32:17
**firearm** 37:16
**fishy** 34:3
**fit** 8:12 9:19 34:19
**flipped** 25:12
**floor** 47:23
**flu** 44:2,4
**focus** 20:5
**FOIA** 23:18
**folder** 8:1 15:1
**folks** 6:18
**follow** 29:20
**forward** 27:21
**found** 6:9 40:9 48:1
**frustrating** 27:25
**future** 26:4

G

**gave** 17:4 25:24 36:11
**General** 4:12
**ghosts** 43:9
**give** 4:12 8:6 20:8
**good** 5:2 8:4 10:17 12:6,18 14:7 17:11 42:23 48:1
**grand** 28:20,22 35:23
**granted** 8:9 20:25
**great** 28:14
**guess** 5:22 12:8

H

**half** 35:10,11
**ham** 28:22
**handle** 17:5
**handlers** 26:25
**happened** 25:21,22 28:24 31:8 35:9
**happy** 27:3
**hard** 29:20 36:3
**harping** 38:8
**head** 34:17,22
**health** 14:18 15:20 16:15 19:20 28:2 34:18 36:14 37:14 42:8 44:24 45:14
**heard** 33:22 43:3,5
**hearing** 4:7 7:22 10:6 12:4,5 36:6 47:15 48:16
**hearsay** 6:19
**helpful** 29:5 39:7 46:10
**hey** 44:3
**higher** 27:11
**HIPAA** 46:20,22
**hobbies** 17:8
**hobby** 45:8
**home** 27:8,9 44:5
**honesty** 4:19 9:13 33:5 34:23
**Honor** 39:13
**hope** 12:15 45:1
**hours** 33:1
**huge** 27:10

I

**IA** 24:19 25:2 30:22 35:18 40:5
**ignore** 14:24
**illness** 33:16 45:9
**images** 41:4
**impact** 9:2 37:12
**impaneled** 28:21
**impeachment** 9:15 36:24
**impede** 45:9
**important** 11:20 27:8 39:10
**impose** 11:10
**improper** 9:23 35:3, 5
**improved** 34:1
**inaudible** 17:2
**incident** 6:6,14 7:11, 13 24:19 43:4
**incidents** 6:7 40:20
**included** 20:6
**indicating** 7:7
**indict** 28:22
**indicted** 28:23
**information** 5:9 39:23
**informing** 30:6
**initially** 25:17
**initiated** 40:6
**insight** 36:2
**integrity** 4:19 9:13 33:5 34:22 35:5
**internal** 10:11 22:10, 12 23:11 24:2,11 40:5 43:3
**interpret** 36:25
**interrupt** 12:21

**interview** 12:14 24:8,20

**interviewed** 23:8 24:3 25:2

**intimate** 12:15

**introduce** 14:22 16:1

**introduced** 35:21

**investigated** 22:11

**investigating** 40:13,14,16

**investigation** 10:4, 11,12 22:9,14,25 24:15,18,20 26:15 28:9,24 30:7,22,23 31:12,15,16 32:8 35:9,19,23 40:5,12 43:3,8

**investigations** 40:25

**involved** 5:10 6:8

**involving** 22:16 43:4

**issue** 19:14 28:11 29:7,8 35:7,12 40:2

**issues** 9:1,2,4,5 14:18 15:16 16:15 18:1,2 28:8 37:14 42:8

J

**jail** 14:5 33:2

**January** 40:6

**Jenkins** 7:18,19 11:23 12:20 16:10,13 39:21,25 41:10,17,25 42:12 43:10

**job** 8:14

**judge** 39:16

**July** 4:21,22,24 9:9 25:22

**June** 19:16 20:18 21:20 34:16 41:25 43:14

**jury** 28:20,22 35:23

**Justice** 8:8 47:4

**justifiable** 10:9 37:1

K

**K-9** 26:25 27:1

**KATZ** 37:15,19,21 47:12 48:3

**KAYTAL** 47:24

**keenly** 33:21

**kind** 17:12 26:23 27:8,14

**knew** 10:2 18:23 45:24

**knowledge** 10:24 12:15 26:14 43:6,7, 12

L

**latitude** 8:18

**launched** 40:4

**law** 6:20 8:10,12,24 10:16 11:8,17,20 14:1 30:10 33:1 36:15 48:12

**learn** 19:13

**leave** 6:2 9:19 29:7 40:22 42:5,11 43:24 44:9,12 45:4,6

**led** 8:22 14:10

**left** 14:7 30:9

**legal** 32:19 47:6,7,8

**legislature** 30:16

**legitimate** 37:1

**letter** 7:3 15:4 20:16 22:9 24:21 25:3,10, 14,20 26:1 28:11 29:1,8,18 30:4,24 31:8,24 32:6 33:19 40:19,23 41:1 43:6

**letterhead** 7:4

**letters** 30:10

**level** 9:24,25 37:10

**lie** 35:5

**lied** 34:24 36:12

**lieutenant** 40:7

**list** 30:13 36:9

**listed** 35:13

**livelihood** 9:17

**living** 31:25

**long** 13:23 15:8

**looked** 36:19

**lot** 27:14

**love** 28:15

M

**made** 7:8 10:2 27:10 31:21 35:16 41:13 47:15

**mail** 48:14

**Major** 7:19 12:20 16:10,13 39:21 41:8 43:10

**make** 17:24 20:7,9, 13 27:14 30:18 32:18 36:17

**makes** 17:11

**making** 45:2

**man** 9:17 37:13 39:15

**March** 23:15

**marked** 15:2 16:4

**MARLOWE** 26:13 27:17,21,23 28:1,4,7 29:10 31:10 32:5,13

**Marlowe's** 36:2

**married** 13:18

**matters** 6:25 47:8

**meant** 36:6

**meantime** 40:11

**mechanism** 30:12, 14 31:3

**mechanisms** 17:4,6 45:21 46:7

**medically** 16:22,23

**medications** 17:2,3

**meeting** 21:21,24 22:1,5,6 43:13 47:5, 14

**member** 7:10 29:12

**members** 42:19

**mental** 14:17 15:20 16:15 19:20 21:17 33:16,25 34:17,25 36:14 37:14 42:8 44:24 45:9,14

**mentally** 17:25 34:19

**mention** 22:8

**message** 18:10

**Middle** 14:4

**midnight** 27:9,12

**mind** 13:13 14:15 20:4 37:11 45:1

**minor** 42:10

**misconduct** 10:10 23:25 24:6 35:13,16, 18,20

**misnumbered** 14:23

**misperceived** 46:15

**month** 19:17

**morning** 17:16

**motion** 47:15,16,22

**move** 47:3,24

**moved** 47:19 48:4

**moving** 27:21

N

**nation-wide** 31:2

**necessarily** 43:17

**needed** 34:24
**nice** 31:22,23 39:10
**nitpicking** 27:14
**note** 5:1 6:18,20 11:7,21 12:2 42:18
**notice** 42:7,9
**noticed** 17:23
**notification** 4:23 9:9 10:21 11:2 29:22 33:11 35:2 48:13
**notified** 40:23
**notify** 18:5,7,9 32:25
**November** 13:25
**numbers** 37:4
**numerated** 8:16

**O**

**object** 11:16
**objection** 6:18 11:7 12:2 42:18
**observed** 5:21
**obtained** 23:15
**obvious** 31:15
**occasionally** 46:4
**occurred** 24:17 40:3
**occurrence** 8:22
**office** 4:10,12,16 5:10,18,25 6:13,15, 24 7:6 9:8 14:4 17:20 19:15 20:5 24:22 26:25 27:2 29:8,17, 22 30:2 39:20 45:5 46:5
**officer** 8:12 9:22,23 14:6 27:1 30:13 33:2 36:7,21 48:13
**officer's** 33:5
**officers** 8:11 10:16 17:24
**official** 6:11
**open** 28:18 37:11 45:1 47:15
**opening** 8:6
**opportunities** 26:4
**opportunity** 34:11 42:15
**opposed** 48:9
**option** 25:24
**order** 4:5 11:12
**outcome** 40:17 48:14
**outdoors** 17:9,10 33:23
**outsider** 36:3
**overturn** 12:6
**overwhelmed** 14:14 17:17

**P**

**p.m.** 26:22 27:12 48:16
**pages** 6:1
**parcel** 40:16
**park** 6:5
**part** 36:5 38:21 40:16
**participate** 45:7
**participated** 24:8
**party** 40:13
**pass** 7:25
**past** 10:16
**patrol** 40:7
**people** 8:14 36:17
**perform** 17:18
**performance** 27:4 33:4 34:9 37:2
**permission** 44:4
**person** 8:12,15 11:2 12:25 45:14
**phone** 23:15 28:19
**pick** 17:7
**places** 8:24 14:7
**planning** 21:7,10,14
**point** 15:23 26:24 29:20 42:4
**police** 7:9 10:10 22:10,12 23:9,14,21, 24 26:14 29:12 30:7, 22 32:24 36:20 40:12,13 43:7
**policy** 5:25 6:1 9:19 35:4 44:10 45:4
**position** 30:20
**power** 8:9
**powers** 10:15
**pre-approve** 43:23
**prepared** 25:11
**preponderance** 10:7
**present** 5:19,20 6:24 7:23 8:7 11:4,24 12:6,18 13:9
**presentation** 42:9
**presented** 20:4 28:12 31:13 41:16,18 47:25
**presenting** 13:2
**pretty** 22:2 30:12
**previous** 14:1
**prior** 35:10,11
**problem** 31:2
**procedurally** 31:10, 12
**proceeding** 39:10
**PROCEEDINGS** 4:1
**process** 12:5 30:18 32:2
**processed** 4:22
**producing** 27:4
**productivity** 8:25
**proffering** 29:19
**program** 15:24 46:1
**properly** 48:4
**protected** 46:22
**provide** 5:2 8:18 39:23 41:5
**provided** 5:9,24
**provision** 47:8
**public** 14:16 18:2,4 47:7
**pulled** 19:15
**punished** 24:11
**purchased** 37:16
**purposes** 10:5
**pursuant** 5:4 47:5
**pursue** 12:9
**put** 12:21 20:11

**Q**

**qualifies** 35:1
**qualities** 39:16
**question** 9:23 12:8 26:17 28:10,13,15 37:22 38:11,20 41:19 42:6 46:18
**questions** 7:20,21 8:7 26:10,11,12 32:13,14 39:11,24 41:7 42:14,16,20 46:24 47:1 48:7
**quotes** 38:1

**R**

**ranks** 39:8
**read** 30:1
**readily** 34:15
**reads** 26:18
**ready** 18:24
**reality** 9:16
**realized** 21:21

**reason** 33:10,11 36:11

**reasons** 8:15 9:21, 22 44:23

**receipt** 6:3 18:17,19, 20

**received** 24:14

**recognize** 11:12,18

**recommended** 33:23 45:22 46:6

**record** 6:18,21 11:6 13:14 26:13

**recovery** 45:9

**recreational** 45:8

**redirect** 26:11

**reference** 10:2 40:19

**references** 29:9

**referral** 16:7 33:20

**referred** 15:23

**referring** 14:25

**refuses** 6:10

**Regional** 14:5

**Regular** 16:20

**reinstate** 48:1,5

**reinstated** 5:3 10:16,19 48:2,13

**reiterate** 36:10

**related** 7:9 26:16 28:1 29:1,6,11,14

**relating** 16:6 29:12

**release** 17:12

**released** 31:8

**relevant** 10:13,14

**rely** 6:14

**remember** 38:5,13, 14

**remove** 8:13

**removed** 9:4 30:13, 25 32:3

**rental** 6:3,4

**report** 23:23 31:20

**reported** 7:8

**reporter** 30:1

**represent** 11:5

**representatives** 5:17 6:12,23

**representing** 8:5

**request** 5:13 8:22 20:6,7,9,14,23,25 21:6 23:18 34:4,6 41:12 44:21

**requested** 5:12 10:22 12:25 20:21 37:25 38:8 44:22

**requesting** 11:3 27:18,24 44:20

**require** 8:16 9:5

**required** 27:5 46:9, 12

**requires** 9:25 35:13

**requiring** 10:1 47:8

**research** 31:1

**reservation** 18:18

**reserve** 26:11

**residence** 5:19

**resign** 25:24

**resignation** 25:20 26:1

**resigned** 26:2

**resigns** 33:3

**response** 18:13 19:22 28:4

**result** 6:6 22:18,21

**results** 24:14 30:21 31:9,17 35:11

**retained** 47:7

**return** 19:1

**returned** 19:2,11 33:25

**Reynolds** 4:9,13,15, 23,24 5:6 6:7 7:7,23 8:5 9:10,18 11:22 13:15 26:21 27:20, 22,25 28:3,5 30:3 32:20 34:23 37:15, 18,20 38:5,12,14,18, 25 39:3,5 40:9 41:6, 20,23 42:21 44:8,14 45:11,16,19,23,25 46:8 48:1,6,11

**Reynolds'** 5:19 6:15 10:8,18 40:2,14,20 41:12

**rid** 9:21

**rise** 9:24,25 37:10

**River** 14:5

**roll** 47:20

**roll-call** 47:13,21 48:10

**rubber** 12:12

**rubber-stamp** 12:10

**rude** 11:9

**rules** 11:10

## S

**sales** 6:3

**sandwich** 28:22

**sat** 42:1

**schedule** 5:11 18:22 26:21 27:3,16

**scheduled** 21:12

**scope** 8:23

**section** 33:8 41:24

**self-employment** 45:7

**sense** 27:15

**separate** 32:22

**Sergeant** 21:25

**serve** 22:3

**service** 18:3

**Services** 8:9 47:4

**session** 19:16

**sessions** 16:20

**seven-year** 9:11

**sheet** 24:24

**sheriff** 4:21 9:7,16 10:1,20 12:22 15:21, 22 16:12,13 23:1 25:24 28:16 29:23 32:24 35:1 39:22 42:4 46:3

**sheriff's** 4:10,16 5:9, 18,25 6:13,24 9:8 13:24 14:4 17:20 26:25 27:2 29:4 39:19 45:5 46:5

**sheriffs** 45:24

**shift** 26:19 27:5

**show** 18:19 36:16

**sic** 14:23 34:21

**sick** 5:7,8,15 6:2 9:24 14:11,13 18:12 19:14,25 21:3 29:7 33:13,14,15,16,18 34:7,13,18,19,24,25 35:1,3,6 36:12,13,22 37:1,6,13 38:3,11,25 41:14,22 42:11 43:15,18,23,24 44:2, 4 45:4,5

**sick-leave** 5:25 33:9

**signed** 4:21

**similar** 10:17

**single** 13:19 27:7

**sir** 12:19 15:25 16:8, 16 19:12 20:15 24:7 28:5 37:23 38:12 39:3,5 41:6,10,18 42:12 45:11,19,23 46:8,21,23

**situation** 17:25 40:22

**Smith** 4:11,14,21 6:23 7:16,21 9:8,16 10:2,20 15:21,22 16:12,13 23:1 29:17

30:1 35:2
**soapbox** 31:6
**sort** 23:23 30:18 31:16,20 32:1,2
**sound** 17:25 30:15
**speak** 6:25 11:22 12:3 26:19 28:16 31:11
**speaking** 29:24 32:5,7
**specific** 47:7
**specifically** 29:10
**spend** 17:8
**spending** 33:23
**spoke** 6:12 32:8
**sport** 45:7
**staffed** 20:9
**stamp** 12:12
**start** 11:19 15:15
**state** 7:9 10:10 13:13 22:10,12 23:9,14,20, 24 26:14 29:11 30:7, 22 34:1 40:11,13 43:7
**stated** 5:14 6:10 21:2 28:8 30:2 38:25 40:2 41:23
**statement** 7:8 8:6 41:20
**statements** 29:11 40:15
**states** 31:2,4
**stating** 37:24 41:11
**statistics** 27:4
**status** 4:13 48:5
**statute** 9:7 36:25
**statutory** 30:14
**Staunton** 14:3
**Stein** 6:17 7:17,24 8:4 10:24 11:6,9,18 12:1,8,13,19,24 13:4, 8,12 14:22 15:3 16:1, 5 26:9 28:14 29:16 31:22 32:11,16,18 39:6,13,16 42:15,18, 24 43:1,22 44:1,11, 17 46:9,16,21,23 47:1,10
**stopped** 43:1,2
**straight** 11:21
**stressed** 14:14 17:17
**strip** 9:16
**struggled** 15:18
**stuck** 30:19
**submission** 4:20
**submitted** 4:17
**subsections** 8:17
**subsequently** 5:15 40:14
**substantiated** 30:21 35:12
**successful** 11:13
**suddenly** 21:22
**suffer** 33:16,17
**suffered** 15:20 33:21
**suffering** 16:14
**summarize** 42:23
**summary** 4:12 7:16
**Sunday** 5:21 19:2
**superior** 19:13
**supervisor** 5:13 38:1 42:1 43:25
**supervisors** 41:13
**support** 39:10
**supported** 35:22
**supporting** 5:23
**supposed** 10:12,13 30:24

**T**

**Tab** 5:24 6:2 7:2
**taking** 19:14 34:24
**talk** 12:25 14:10
**talking** 38:21
**terminated** 25:17,25 32:4 33:3,10 37:7 46:14
**termination** 25:16
**terms** 14:8
**testified** 29:17 31:16
**testify** 25:4,9,12,14 39:9
**testifying** 6:19
**testimony** 6:11,15 7:14 29:4 33:22 34:8
**text** 12:21 18:10 44:8
**therapeutic** 45:13, 15,22
**therapeutically** 16:23
**therapist** 16:18 33:22
**therapy** 16:20
**thing** 27:8,14 38:7 43:18 45:3
**things** 26:22 32:22 34:4 36:3 40:1 45:17 46:19
**Thirty-four** 13:17
**threw** 42:2
**throwing** 44:5
**time** 5:12 7:20,25 9:24 13:18 17:8,10 20:13 25:1,2 26:10 27:24 33:9,23 34:3,4 35:4,6 39:1 41:23
**timely** 4:24
**times** 25:6 27:18
**today** 10:7 14:11 47:25
**told** 17:7 19:19,23 23:1
**top** 16:9
**touch** 22:11
**TRANSCRIPT** 4:1
**trash** 42:3
**tremendous** 8:18
**trial** 9:15
**trip** 19:7 21:22 34:14 38:23 46:15
**true** 41:15,17 44:11
**truth** 12:10
**typical** 20:10

**U**

**ultimately** 8:19 33:10
**unauthorized** 33:12
**Unbeknownst** 40:18
**uncharged** 10:3
**undated** 7:4
**understand** 12:13 17:14 36:1 38:12
**understanding** 44:1
**Understood** 46:16
**unfit** 8:14,15
**unfounded** 10:3 30:6 40:8 43:4
**unreliable** 37:5
**unsigned** 7:4
**untruthful** 5:6
**upset** 22:2 27:15 30:12 38:16,18 42:2

**V**

**vacation** 20:9
**vehemently** 26:2

**vehicle** 29:15

**veteran** 9:11

**violation** 35:4

**Virginia** 7:9 10:10 22:9,12 23:8,14,20, 24 29:11 30:7,22 37:17 40:11 43:7 47:5

**volume** 27:11

**vote** 47:13 48:10

**VSP** 35:8

W

**wanted** 41:1 45:18

**warrant** 23:15 28:18

**weakness** 36:16

**weekend** 5:16 6:3 27:18 38:23,25 41:22

**weeks** 21:6

**well-staffed** 38:19

**Wells** 18:8 21:25 39:7,9

**woke** 17:16 21:16

**woods** 17:13

**work** 18:23 19:3,5,9 21:8,11,14 33:25 34:20 41:14

**worked** 14:3,4

**working** 5:14 36:15 38:2

**workplace** 8:25

**wrap** 42:22

**wreck** 40:14

**write-up** 20:17 22:3 42:1,3

**writing** 32:25

**written** 27:17 48:13

**wrong** 23:5 37:3 40:10

**wrote** 10:21

Y

**year** 14:4 20:8,10,11 35:9,10

**year-and-a-half-old** 10:3

**years** 13:21,22 14:5, 6

**young** 27:7

Z

**Zoom** 10:23 12:22